**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CORAZON TABION,
Plaintiff-Appellant,

v.                                                                No. 95-1732

FARIS MUFTI; LANA MUFTI,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis III, District Judge.
(CA-94-1281-A)

Argued: November 2, 1995

Decided: January 17, 1996

Before MURNAGHAN, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Michael and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Joseph John Aronica, MUDGE, ROSE, GUTHRIE,
ALEXANDER & FERNDON, Washington, D.C., for Appellant. Earl
Ferdinand Glock, III, Washington, D.C., for Appellees. **ON BRIEF:**
Edward Leavy, Edith R. Albert, MUDGE, ROSE, GUTHRIE, ALEX-
ANDER & FERNDON, Washington, D.C.; John P. Connolly, LAW
OFFICES OF JOHN P. CONNOLLY, Alexandria, Virginia, for
Appellant.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, provides nearly absolute civil and criminal immunity for diplomatic personnel stationed in foreign countries.[1] That Appellees Faris and Lana Mufti are covered by the Vienna Convention because of Mr. Mufti's position as a First Secretary, and later Counsellor, of the Jordanian Embassy in Washington, D.C., is evident. The question presented here is whether the diplomatic immunity afforded by the Vienna Convention protects the Muftis from a civil lawsuit brought by their domestic servant.

I.

Appellant Corazon Tabion, a Philippine national, performed domestic services in the Muftis' Virginia home for more than two years. Believing that her low pay and long hours violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., Tabion sued the couple in federal district court. She stated numerous complaints arising from the employment relationship, including breach of contract, intentional misrepresentations in employment, false imprisonment, violations of 42 U.S.C. §§ 1981 and 1985(3), and FLSA infractions. Tabion sought compensatory damages, punitive damages, attorney's fees and costs.

After a hearing, the district court judge found the Muftis protected by diplomatic immunity and quashed their service of process. The judge determined that the phrase "commercial activity" as used in one of the three exceptions to civil immunity enumerated in Article 31 of the Vienna Convention did not cover the Muftis' employment relationship with Tabion. The judge therefore ruled the suit barred by the Vienna Convention. Tabion has appealed, challenging the court's interpretation and conclusion by arguing that her domestic service for

_____

[1] The Vienna Convention became applicable to the United States by the Diplomatic Relations Act, 22 U.S.C. §§ 251-59, which repealed earlier laws governing diplomatic immunity. Both the United States and Jordan, as well as nearly 150 other countries, have signed the treaty.

2

the Muftis amounted to commercial activity exercised outside the Muftis' official functions. Because the determination is one of law, we review the district court's ruling de novo . Eckert Int'l, Inc. v. Government of Fiji, 32 F.3d 77, 79 (4th Cir. 1994).

II.

Treaties are contracts between sovereigns, and as such, should be construed to give effect to the intent of the signatories. United States v. Stuart, 489 U.S. 353, 365-66 (1989); Nielsen v. Johnson, 279 U.S. 47, 51 (1929). The court should look at the treaty's language, considering the context in which the words were used. Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991). Treaties generally are liberally construed: courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties" to ascertain the meaning of a difficult or unclear passage. Id. at 535 (internal quotation omitted); see also Nielsen, 279 U.S. at 51-52.

The Vienna Convention provides diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the "receiving State," i.e., the state where they are stationed. Article 31 lists three exceptions to a diplomat's civil immunity. Chief among them, and at issue here, is the elimination in Article 31(1)(c) of immunity from actions "relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." 23 U.S.T. at 3241. Also relevant to the present matter is Article 42's pronouncement that "[a] diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity." Id. at 3247.

Nowhere in the Vienna Convention is the term "commercial activity" defined.[2] Yet we must determine the meaning of the phrase in order to resolve the present dispute. Tabion contends that the language is plain. Because "commerce" is simply the exchange of goods

_____

[2] Nor does there appear to be any published judicial opinion in the United States construing the phrase as it is used in the Vienna Convention.

3

and services, she argues, "commercial activity" necessarily encompasses contracts for goods and services, including employment contracts.

The term "plain meaning" is frequently employed to characterize language of seemingly unambiguous clarity. While easily understood as denoting the unquestioned meaning of a text, the term often proves difficult to apply as used in specific individual cases. Seldom does language carry one true and undisputed meaning.

The phrase "commercial activity" is no exception. Tabion received some pay,[3] and she undoubtedly was active in her work for the Muftis. Looking solely at the words "commercial" and "activity," then, the phrase "commercial activity" could logically encompass the Muftis' dealings with Tabion. But such a literal manner of interpretation is superficial and incomplete, and, we believe, yields an incorrect rendering of the meaning of "commercial activity" as used in the Vienna Convention. When examined in context, the term "commercial activity" does not have so broad a meaning as to include occasional service contracts as Tabion contends, but rather relates only to trade or business activity engaged in for personal profit. Accepting the broader meaning fails to take into account the treaty's background and negotiating history, as well as its subsequent interpretation. It also ignores the relevance of the remainder of the phrase--"outside his official functions."

Prior to adoption of the Vienna Convention, American law extended diplomats immunity from civil suit as absolutely as immunity from criminal jurisdiction: both were without exception. Such comprehensive diplomatic immunity was part of the Act of April 30, 1790,[4] which remained in force until 1978, when Congress passed the Diplomatic Relations Act and made the Vienna Convention the governing law in the United States.[5] The agreement itself makes clear in its pre-

_____

[3] Although from Tabion's point of view, the pay was insufficient.
[4] Ch. 9, §§ 25-27, 1 Stat. 117-8 (repealed 1978).
[5] The Vienna Convention entered into force for the United States in 1972. As noted above, the Diplomatic Relations Act repealed earlier laws and left the Vienna Convention as the sole law governing diplomatic immunity in the United States.

4

amble that the purpose of its statements of privilege and immunity are "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." 23 U.S.T. at 3230. Although the drafters of the Vienna Convention recognized that a diplomat's engaging in professional or commercial activity for profit in the receiving state had always been contrary to international standards of conduct, they decided to provide explicit language to make abundantly clear that such conduct was undiplomatic. They did so in Article 42. See 23 U.S.T. at 3247.

The United States Department of State narrowly interprets the Article 31(1)(c) exclusion based on the agreement's negotiating history. In a statement of interest filed in the present matter, the State Department concluded that the term "commercial activity" as used in the exception "focuses on the pursuit of trade or business activity; it does not encompass contractual relationships for goods and services incidental to the daily life of the diplomat and family in the receiving State."[6] Statement of Interest of the United States at 4. Substantial deference is due to the State Department's conclusion. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982); Demjanjuk v. Petrovsky, 776 F.2d 571, 579 (6th Cir. 1985), cert. denied, 475 U.S. 1016 (1986), judgment vacated, 10 F.3d 338 (6th Cir. 1994); Spacil v. Crowe, 489 F.2d 614, 619 (5th Cir. 1974).

Legal commentators similarly characterize the exception as covering only a diplomat's participation in trade or business, and not his everyday transactions. One scholar has concluded that, while Article

_____

[6] Federal government officials have consistently interpreted the provision narrowly, advising Congress during its consideration of the Vienna Convention in 1965 and passage of the Diplomatic Relations Act in 1978 that the "commercial activity" exception was"minor" and "probably meaningless" because it merely exposed diplomats to litigation based upon activity expressly prohibited in Article 42. See, e.g., Diplomatic Immunity: Hearings on S. 476, S. 477, S. 478, S. 1256, S. 1257 and H.R. 7819 Before the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 32 (1978); see also The Diplomatic Privileges and Immunities Act: Hearings on H.R. 3036 Before the Subcomm. on Int'l. Operations of the House Comm. on Foreign Affairs, 100th Cong., 2d Sess. 268-69 (1988) (characterization by State Department of exclusion as narrow).

5

31(1)(c)'s exception is broadly drawn, "it is not intended to cover commercial contracts incidental to the ordinary conduct of life in the receiving State." Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 166-67 (1976). Restatement (Third) of the Foreign Relations Law of the United States § 464, Reporter's Note 9 (1986), states:

> The denial of immunity in cases arising out of private commercial or professional activities has little significance for the United States since the United States forbids its diplomatic officers to engage in commercial or professional activities unrelated to their official functions, and in general does not permit such activities by foreign diplomats in the United States.

It is evident from the foregoing authorities that the phrase "commercial activity," as it appears in the Article 31(1)(c) exception, was intended by the signatories to mean "commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."[7] Day-to-day living services such as dry cleaning or domestic help were not meant to be treated as outside a diplomat's official functions. Because these services are incidental to daily life, diplomats are to be immune from disputes arising out of them.

Finally, Tabion claims a violation of her rights under the Equal Protection Clause of the United States Constitution. Because Tabion

_____

[7] Despite Tabion's suggestion to the contrary, we decline to use the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., as an interpretive guide for the Vienna Convention. The FSIA is a statute which establishes the framework for determining when federal or state courts in the United States may exercise jurisdiction over foreign states; it is not a treaty dealing with many countries. In addition, the FSIA was enacted after the Vienna Convention on Diplomatic Relations came into existence, and thus could not have been a textual source for Convention delegates. Furthermore, Congress did not intend for the FSIA to affect diplomatic immunity under the Vienna Convention. See H.Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610. Section 1609 specifically states that Congress enacted the FSIA "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act."

6

failed to raise that claim in the district court, it must fail. Fowler v. Land Management Groupe, Inc., 978 F.2d 158, 164 (4th Cir. 1992); Bakker v. Grutman, 942 F.2d 236, 242 (4th Cir. 1991).

III.

Here, as in most cases invoking sovereign immunity, there may appear to be some unfairness to the person against whom the invocation occurs. But it must be remembered that the outcome merely reflects policy choices already made. Policymakers in Congress and the Executive Branch clearly have believed that diplomatic immunity not only ensures the efficient functioning of diplomatic missions in foreign states, but fosters goodwill and enhances relations among nations. Thus, they have determined that apparent inequity to a private individual is outweighed by the great injury to the public that would arise from permitting suit against the entity or its agents calling for application of immunity.

As the district court correctly notes in its well-reasoned opinion, "diplomatic immunity does not provide an unconstrained license to violate contracts and United States laws."[8] It merely seeks to protect American diplomats from criminal and civil prosecution in alien lands and to enhance relations among the United States and foreign countries.[9] Applying diplomatic immunity as set forth in the Vienna Convention to the case at bar, we conclude that the Muftis are protected from

_____

[8] Diplomats are bound to follow the laws of the receiving State. See 23 U.S.T. at 3247. And the receiving State has various extra-judicial means of enforcing the obligation.

[9] Because of the reciprocal nature of the agreement, a decision extending the "commercial activity" exception to eliminate civil immunity from such a suit as Tabion's would create the spectre of foreign states around the world following the ruling, thereby forcing diplomats to defend lawsuits over living services that result in no monetary profit to them. Such a ruling could only subject American diplomats to the risk of liability under foreign laws and reduce the efficient performance of their diplomatic missions abroad.

7

Tabion's claims. The district court's judgment granting the Muftis' motion to quash is accordingly

<u>AFFIRMED</u>.

8