PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

IBRAHIM AHMED AL-HAMDI,
*Defendant-Appellant.*

No. 03-4452

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

IBRAHIM AHMED AL-HAMDI,
*Defendant-Appellant.*

No. 03-4655

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-03-158-A)

Argued: December 5, 2003

Decided: January 23, 2004

Before WILLIAMS, KING, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge King and Judge Duncan joined.

---

**COUNSEL**

**ARGUED:** Salim Ali, BECKER, HADEED, KELLOGG & BERRY, P.C., Springfield, Virginia, for Appellant. David Howard Laufman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

In this appeal, Ibrahim Al-Hamdi, a citizen of the Republic of Yemen, contests his prosecution and conviction for violating 18 U.S.C.A. § 922(g)(5)(B) (West 2000), which prohibits possession of a firearm by a non-immigrant alien. Al-Hamdi's principal argument is that, as the family member of a diplomat, he possessed diplomatic immunity at the time of his arrest and that the State Department later tried to revoke that immunity retroactively, in violation of the Vienna Convention on Diplomatic Relations and the United States Constitution. Finding that the State Department's interpretation of who is a "member[ ] of the family of a diplomatic agent forming part of his household" (member of the family) for purposes of the Vienna Convention is reasonable, we accept its certification as conclusive evidence that Al-Hamdi, at the time of his arrest, was not a "member of the family" and hold that Al-Hamdi did not have diplomatic immunity. We also hold that the State Department's actions in this matter did not violate the constitutional guarantee of due process.

I.

On February 25, 2003, officers from the Federal Bureau of Investigation (FBI) and the Immigration and Naturalization Services (INS),[1]

---

[1]Although we follow the parties' usage of INS, we recognize that effective March 1, 2003, the INS changed its name to the Bureau of Citizenship and Immigration Services. (BCIS)

executed a search warrant at the Annandale, Virginia apartment of Ibrahim Al-Hamdi. Upon entering the residence, one of the occupants told the officers that Al-Hamdi kept a rifle in the apartment. Soon thereafter, the agents discovered a loaded .308 caliber rifle with a telescopic site in Al-Hamdi's closet. Al-Hamdi was subsequently indicted by a federal grand jury on April 17, 2003, for possession of a firearm by a non-immigrant alien, in violation of 18 U.S.C.A. § 922(g)(5)(B).

Based on the belief that he was immune from prosecution, *see* Vienna Convention on Diplomatic Relations, April 18, 1961, art. 37.1, 23 U.S.T. 3227 (hereinafter "Vienna Convention") (stating that members of a diplomat's family also have diplomatic immunity), Al-Hamdi filed a motion to dismiss the indictment on May 12, 2003, in the United States District Court for the Eastern District of Virginia. After an oral hearing, the district court denied the motion by an order dated May 16, 2003, and Al-Hamdi filed an interlocutory notice of appeal on May 27, 2003. On June 5, 2003, Al-Hamdi pleaded guilty to the firearms charge but reserved his right to appeal on the ground of diplomatic immunity. The district court sentenced Al-Hamdi to eighteen months imprisonment and three years of supervised release on August 1, 2003. Al Hamdi filed a second timely notice of appeal on August 15, which was consolidated with the first notice of appeal.[2]

Al-Hamdi was born in Yemen on November 12, 1977, but moved to the United States in 1993 when his father, Ahmed Ali Saleh Al-Hamdi, was appointed as a Minister at the Republic of Yemen's embassy in Washington, D.C. The Government agrees that in 1993 Al-Hamdi and his father possessed diplomatic immunity pursuant to the Vienna Convention. Al-Hamdi celebrated his twenty-first birthday in November 1998. He was not enrolled in school at the time, and his diplomatic identification card, given to all persons with diplomatic immunity, expired on December 12, 1998. The Yemeni embassy applied for a new identification card for Al-Hamdi on December 1,

---

[2]Because Al-Hamdi entered into a plea agreement before action was taken on his first appeal, the first appeal was consolidated with his second appeal. We thus have jurisdiction because the second appeal is from a final order, the conviction and sentencing. 28 U.S.C.A. § 1291 (West 1993).

1999, but the State Department requested more information before it would grant the request. No further information was provided, and Al-Hamdi was never issued a new identification card. Al-Hamdi, however, continued to be issued A-1 visas[3] after 1999 and has entered the United States with an A-1 visa on numerous occasions since 1999.

On March 31, 2003, the State Department sent a letter to the Yemeni embassy stating that Al-Hamdi's father lost his diplomatic immunity on that date because he no longer performed full-time services for Yemen at the embassy. On May 15, 2003, in response to Al-Hamdi's motion to dismiss the indictment, the State Department certified that Al-Hamdi lost his diplomatic immunity on November 12, 1998, the date of his twenty-first birthday. Thus, according to the May 15 certification, Al-Hamdi did not possess diplomatic immunity at the time of his arrest.

## II.

On appeal, Al-Hamdi's principal argument is that he possessed diplomatic immunity at the time of his arrest on February 25, 2003, and was thus immune from prosecution. He also contends that the State Department's May 15, 2003, certification retroactively revoked that immunity, in violation of his substantive and procedural due process rights as guaranteed by the Fifth Amendment of the Constitution.[4] We address each of these arguments in turn.

---

[3]A-1 visas are given to non-immigrants who are defined under the immigration laws as having A-1 status. Those non-immigrants include "an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government, recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family." 8 U.S.C.A. § 1101(a)(15)(A)(i) (West Supp. 2003).

[4]Al-Hamdi also contends the alleged retroactive revocation violated the Administrative Procedures Act, 5 U.S.C.A. §§ 551-559 (West 1996 & Supp. 2003) (APA), and the Ex Post Facto clause of the Constitution. Al-Hamdi did not raise these arguments below, and "[i]t is an accepted rule of appellate procedure that ordinarily an appellate court will not consider an issue not raised in the court from which the appeal is taken." *United States v. Davis*, 954 F.2d 182, 187 (4th Cir. 1992) (quotation

The determination of whether a person has diplomatic immunity is a mixed question of fact and law. We review such questions "under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining de novo the legal conclusions derived from those facts." *Gilbaine Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996); *see also United States v. Han*, 74 F.3d 537, 540 n. 1 (4th Cir. 1996) (explaining the application of the hybrid standard). Interpretation of an international treaty is an issue of law subject to de novo review. *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996).

## A.

In pertinent part, the Vienna Convention states that a "diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." Vienna Convention at art. 31.1. Article 37.1 reads "members of the family of a diplomatic agent forming part of his household shall . . . enjoy the privileges and immunities specified in Articles 29 to 36." Vienna Convention at art 37.1. The Diplomatic Relations Act, which made the Vienna Convention applicable to the United States, *see Tabion*, 73 F.3d at 536 n.1, provides that the phrase "members of the family" means the "members of the family of a member of a mission . . . who form part of his or her household." 22 U.S.C.A. § 254a(2)(A) (West 1990). That Act also provides, quite clearly, that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding . . . shall be dismissed." 22 U.S.C.A. § 254d (West 1990). Thus, under the plain language of the statute, if, at the time he was arrested, Al-Hamdi was entitled to diplomatic immunity under Article 37.1 of the Vienna Convention, the criminal proceedings against him must be dismissed.

---

marks omitted). When "fundamental rights are involved," this rule may be relaxed to prevent "manifest injustice." *Davis*, 954 F.2d at 187. Because Al-Hamdi did raise his due process claims below, and because the due process claims address the same State Department action, no manifest injustice would result from failing to consider Al-Hamdi's APA and Ex Post Facto claims.

In its May 15, 2003 letter, the State Department certified that Al-Hamdi lost his diplomatic immunity in November 1998. The State Department based its certification on a Circular Diplomatic Note[5] that it issued in 1989. United States Department of State, Circular Diplomatic Note of November 15, 1989. (S.A. at 3.) That Circular Note articulated the State Department's position that the phrase "members of the family," as set forth in the Vienna Convention and the Diplomatic Relations Act, did not include children over the age of twenty-one. (S.A. at 5.) The 1989 Circular Note provided, however, that children of certified diplomats still enrolled in school are considered family members until their twenty-third birthday. *Id.* (S.A. at 5). The 1989 Circular Note was provided to all foreign missions and remains in force, but because the Republic of Yemen was not formed until 1990, it did not receive the Circular Note during 1989.

In 1998, the State Department published guidelines for administrative officers that restated the age limitations on children who are considered members of the diplomatic family as had been originally stated in the 1989 Circular Note and explained that "it is generally agreed that host States may formulate reasonable definitions" of the phrases used in the Vienna Convention. United States Department of State, *Foreign Diplomatic and Career Consular Personnel in the United States - Guidance for Administrative Officers* (1998).[6] (S.A. at 25-28.) The State Department provided that publication to all foreign embassies in the United States, including the Yemeni embassy.

---

[5]Diplomatic Notes are used for correspondence between the State Department and foreign governments. *See* United States Department of State, 5 Foreign Affairs Manual 212h; United States Department of State, 5 Foreign Affairs Handbook 1 H-611(a). A Circular Diplomatic Note is an identical note sent to multiple foreign governments or missions. United States Department of State, 5 Foreign Affairs Handbook 1 H-612.2-7.

[6]The Foreign Affairs Manual does not define the term "Guidance," however, it does define "Guidebooks" such as "guidelines, internal procedures, etc." as State Department publications that summarize entries in the Foreign Affairs Manual or relate to isolated issues and have no regulatory force. United States Department of State, 2 Foreign Affairs Manual 1115.5-2. Because the term "Guidance" is not defined elsewhere, we assume that a Guidance falls within that definition.

The Government forcefully argues that the State Department's certification of Al-Hamdi's lack of immunity is conclusive and thus judicially unreviewable. The Government concedes, however, that the State Department cannot act outside the Vienna Convention in issuing a certification and also admits that in this case the State Department's certification is based upon its own interpretation of the Vienna Convention, not the plain language of that document. Thus, we believe we first must ensure that the State Department's certification was not based on an impermissible interpretation of the Vienna Convention. Then, we will examine the evidentiary effect of the State Department's certification made pursuant to that interpretation.

When interpreting a treaty, we "first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). When the text is ambiguous or unclear, we turn to nontextual sources for guidance. *See United States v. Li*, 206 F.3d 56, 63 (1st Cir. 2000) (en banc); *Tabion v. Mufti*, 73 F.3d 535, 537-538 (4th Cir. 1996). When looking at nontextual sources, we are reminded that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982); *see also Iceland Steamship Co. v. United States Dep't of the Army*, 201 F.3d 451, 458 (D.C. Cir. 2000) (giving "great weight" to the State Department's interpretation of a U.S.-Iceland defense treaty). Therefore, because the State Department is charged with the responsibility of enforcing the Vienna Convention, we give "[s]ubstantial deference" to the State Department's interpretation of that treaty's provisions. *Tabion*, 73 F.3d at 538;[7] *see also Li*, 206 F.3d at 63.

The phrase "members of the family of a diplomatic agent forming

---

[7]For example, in *Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996), we faced the issue of whether employing a domestic servant is the sort of "commercial activity" outside the scope of the immunities listed in the Vienna Convention. After noting that "[n]owhere in the Vienna Convention is the term 'commercial activity' defined," we relied upon the State Department's narrow interpretation of the phrase in holding that the employment of a domestic servant was not a "commercial activity." *Tabion*, 73 F.3d at 537-539.

part of his household" is not free from ambiguity, as seen by the dif-
fering interpretations offered by both Al-Hamdi and the Government.
As mentioned, the State Department, since 1989, has consistently
interpreted the "member of the family" provision of Article 37.1 to
include only children under the age of twenty-one as forming part of
the household unless they are continuing their education. Al-Hamdi
argues that diplomatic immunity extends to all "members of the fam-
ily" and contends that the Vienna Convention does not allow for an
age restriction.[8] At its core, Al-Hamdi's argument asks us to find that
his interpretation of the Vienna Convention's language is more rea-
sonable than the State Department's interpretation. We give "substan-
tial deference" to the State Department's interpretation of a treaty, and
in the context of diplomatic immunity, the receiving state always has
had "broad discretion to classify diplomats." *Abdulaziz v. Metropoli-
tan Dade County*, 741 F.2d 1328, 1331 (11th Cir. 1984). Moreover,
and perhaps most important, Al-Hamdi has failed to show how the
State Department's interpretation violates the dictates of the Vienna
Convention or infringes upon the Convention's purpose of "ensur-
[ing] the efficient performance of the functions of diplomatic mis-
sions as representing States." Preamble of the Vienna Convention.
Although Al-Hamdi's interpretation is not unreasonable, given the
substantial deference we owe the State Department and the lack of
any showing that the State Department's interpretation either
infringes on the purpose of the Vienna Convention or is disconsonant
with its plain language, we hold that the phrase "member of the fam-
ily" can reasonably be interpreted to exclude children who have
reached twenty-one years of age and children still in school who have
reached the age of twenty-three. *See also Iceland Steamship*, 201 F.3d

---

[8]In his reply brief, Al-Hamdi argued, for the first time, that he satisfied
the Vienna Convention's only limitation, that the individual "form[s] part
of [the diplomat's] household." (Appellant's Reply Br. at 4, 6.) Al-
Hamdi alleges that he was part of his father's household because his
father continued to support him financially, paying the rent for Al-
Hamdi's apartment and remaining the apartment's lessee. (Appellant's
Reply Br. at 6.) It is a well settled rule that contentions not raised in the
argument section of the opening brief are abandoned. *Edwards v. City of
Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). Moreover, the ques-
tion of whether Al-Hamdi can prove that he was part of his father's
household is not relevant to the inquiry of whether the State Depart-
ment's interpretation of "members of the family" is reasonable.

at 458 (holding that where State Department has "wide latitude" in interpreting a treaty, a court should "defer to [the agency's] reasonable interpretation") (quotation marks omitted).

### B.

Having concluded that the State Department's certification was based on a reasonable interpretation of the Vienna Convention, we address the issue of its evidentiary weight. The Government, as discussed above, argues that such certifications are conclusive on the matter of diplomatic immunity. For support, the Government relies upon two Supreme Court cases from the nineteenth century and more recent circuit court precedent. In *In re Baiz*, the Supreme Court relied upon a State Department certification in finding that an individual was not a foreign minister. *In re Baiz*, 135 U.S. 403 (1890). The Court stated that because Article II of the Constitution gave the executive branch the power to send and receive ambassadors, "the certificate of the [S]ecretary of [S]tate . . . is the best evidence to prove the diplomatic character of a person accredited as a minister." *Id.* at 421. The Court concluded, "we do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister." *Id.* at 432. Six years prior, in *Ex Parte Hitz*, 111 U.S. 766 (1884), the Supreme Court denied a writ requesting original jurisdiction in the Supreme Court. At that time, the Supreme Court possessed original, mandatory jurisdiction over all cases involving ambassadors, but the Court relied upon the State Department's finding that Hitz was no longer an accredited diplomat to conclude that the writ was discretionary with the Court and denied the writ. *Ex Parte Hitz*, 111 U.S. at 768.

In cases of more recent vintage, circuit courts have continued to find the State Department's certification conclusive. *See*, *e.g.*, *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949) (noting "[it] is enough that an ambassador has requested immunity, that the State Department has recognized that the person . . . is entitled to it, and that the Department's recognition has been communicated to the court"); *Abdulaziz*, 741 F.2d at 1331 (finding "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status"). In fact, it appears that no reviewing court

has ever held that the State Department's certification is anything but conclusive.

   The only authority that remotely counsels against judicial acceptance of State Department findings in the context of diplomatic immunity is *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995). In *Lamagno*, the Supreme Court held that certifications made by the Attorney General under the Westfall Act, 28 U.S.C.A. § 2679(d)(1) (West 1994), were subject to judicial review. The Westfall Act provides "[u]pon certification by the Attorney General . . . any civil action . . . shall be deemed an action against the United States." 28 U.S.C.A. § 2679(d)(1). The Court held that "[b]ecause the statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Lamagno*, 515 U.S. at 434. We do not find *Lamagno* controlling or persuasive here. Unlike the Westfall Act, the traditional view in cases involving diplomatic immunity and the Article II power to send and receive ambassadors is not one of judicial review. Instead, the traditional view in these cases, as stated in *Ex Parte Hitz* and *In re Baiz*, is one of judicial acceptance of the certifications of the State Department. Moreover, the *Lamagno* Court was concerned with the Attorney General's incentive to grant certification when the United States was immune from suit, thereby shielding a federal employee from liability while not exposing the United States to liability. *Lamagno*, 515 U.S. at 427-428.[9] The State Department has no similar

---

   [9]*Lamagno* concerned the Attorney General's scope-of-employment certification. *Lamagno*, 515 U.S. at 420. When a federal employee is sued for negligence, the Attorney General can certify that the employee was acting within the scope of his employment. *Id.* Upon certification, the United States is substituted as a defendant. Normally, a certification benefits the plaintiff because his claim proceeds against the financially secure United States under the Federal Tort Claims Act (FTCA). *Id.* Under the facts of *Lamagno*, however, certification left the plaintiff without a tort action against any party because the incident occurred abroad and the FTCA does not waive sovereign immunity for claims arising abroad. *Id.* In considering the reviewability of the certification, the Court was influenced by the "marked" "incentive . . . to certify" and recognized that the "impetus to certify becomes overwhelming in cases like this one." *Id.* at 424, 427. As discussed in the text infra, these incentives do not exist in the diplomatic immunity context.

incentive to deny diplomatic immunity to deserving individuals and thereby risk international disfavor. As the Supreme Court has stated, "the certificate of the secretary of state . . . is the best evidence to prove the diplomatic character of a person." *In re Baiz*, 135 U.S. at 421.

For the foregoing reasons, we hold that the State Department's certification, which is based upon a reasonable interpretation of the Vienna Convention, is conclusive evidence as to the diplomatic status of an individual. *Cf. United States v. Kostadinov*, 734 F.2d 905 (2d Cir. 1984) (determining first that individual was not automatically covered by the Vienna Convention because of his employment in an embassy building and then accepting the State Department's determination as to whether the individual was a diplomatic agent). Thus, we will not review the State Department's factual determination that, at the time of his arrest, Al-Hamdi fell outside of the immunities of the Vienna Convention because he had passed his twenty-first birthday and he was no longer in school. Lacking diplomatic immunity, Al-Hamdi was subject to the criminal laws of the United States on February 25, 2003, when he was found in possession of a firearm.

## C.

Al-Hamdi next argues that, even assuming the State Department was correct that his diplomatic immunity should have expired in 1998, the State Department continued to issue him A-1 visas after November 1998, and thus continued to certify his diplomatic status. This argument is unavailing. A 1985 Circular Note stated that possession of an A-1 visa, standing alone, did not prove the diplomatic status of an immigrant. United States Department of State, Circular Note of October 23, 1985. (S.A. at 43-44.) Moreover, a 1998 publication explained, "the only authoritative [diplomatic] identity document is the identity card issued by the United States Department of State." *See* United States Department of State, *Diplomatic and Consular Immunity - Guidance for Law Enforcement and Judicial Authorities* (1998) (the 1998 *Guidance*). (J.A. at 47.) An A-1 visa, the 1998 *Guidance* explained, was merely a document that allowed non-immigrant foreigners linked to diplomatic or humanitarian missions to enter the United States. *Id.* (J.A. at 47.) We conclude that Al-Hamdi's possession of an A-1 visa, standing alone, cannot confer diplomatic immu-

nity upon him.[10] Unfortunately, Al-Hamdi's evidence of diplomatic immunity, his identification card, expired in 1998 and was never reissued. Accordingly, the State Department's issuance of an A-1 visa to Al-Hamdi did not confer diplomatic status, and he was subject to the criminal jurisdiction of the United States at the time of his arrest.

III.

Al-Hamdi also alleges that the State Department's certification that his diplomatic immunity had lapsed violated his Fifth Amendment[11] right to due process.[12] Here, Al-Hamdi argues that the State Department, by certifying in May 2003 that he lost his diplomatic immunity in November 1998, violated both his substantive and procedural due process rights. Al-Hamdi argues first that the certification letter violated his substantive due process rights by retroactively revoking his immunity. An executive act can violate substantive due process only when the act shocks the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In such cases, "the issue of fatal arbitrariness should be addressed as a threshold question." *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (quotation marks omitted). "If it does not meet that test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest." *Id.*

---

[10]Our conclusion is buttressed by the findings of a sister circuit. In *United States v. Kostadinov*, 734 F.2d 905 (2d Cir. 1984), the Second Circuit held that "a visa does not necessarily confer diplomatic immunity." *Id.* at 912. The court instead relied upon the fact that "Kostadinov never received a diplomatic identity card." *Id.*

[11]Al-Hamdi's brief alleges that the State Department violated the Fourteenth Amendment, but actions of the federal government are reviewed under the Fifth Amendment. Regardless, the standards employed by the Supreme Court in analyzing due process claims under the Fourteenth Amendment apply with equal force to claims raised under the Fifth Amendment. *See generally Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1349 n.4 (4th Cir. 1991).

[12]Contrary to the Government's argument, Al-Hamdi did preserve this issue for appeal. During the oral hearing on the motion to dismiss the indictment, Al-Hamdi's counsel stated that the actions taken by the State Department were "a clear violation of the defendant's due-process rights, both substantively and procedurally." (J.A. at 28.)

If an executive act does shock the conscience, then the "inquiry must turn to the nature of the asserted interest, hence to the level of protection to which it is entitled." *Id.* Al-Hamdi's claim must fail because, *assuming arguendo* that a retroactive revocation of immunity would shock the conscience, the State Department did not act retroactively. Instead, the State Department merely certified that, pursuant to its longstanding interpretation of the Vienna Convention, Al-Hamdi's immunity had expired in 1998.

Al-Hamdi also alleges that the State Department's certification violated his procedural due process rights. Al-Hamdi's argument is that, even assuming the State Department's certification was appropriate, procedural due process required either a post-deprivation hearing or notice regarding Al-Hamdi's loss of immunity. The Fifth Amendment provides that a person shall not "be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. Given this constitutional command, we pose two questions when reviewing a claimed procedural due process violation: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted). While it is doubtful that Al-Hamdi possesses a liberty or property interest in his diplomatic immunity,[13] *assuming arguendo*

---

[13]The Vienna Convention itself states that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions." Preamble to the Vienna Convention. "[D]iplomatic immunity primarily serves the needs of the foreign sovereign." *United States v. County of Arlington*, 669 F.2d 925, 930 (4th Cir. 1982). "The privilege extended to an individual diplomat is merely incidental to the benefit conferred on the government he represents." *Id.*; *see also The Exchange*, 11 U.S. 116, 138 (1812) (recognizing diplomatic immunity serves the interests of the foreign sovereign because "without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad"); *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328, 1330 (11th Cir. 1984). "Even where a treaty provides certain benefits for nationals of a particular state . . . it is traditionally held that any rights arising from such provisions are, under international law, those of the states and . . . individual rights are

that Al-Hamdi has a liberty or property interest in his diplomatic immunity, we conclude, for the following reasons, that the procedures provided by the State Department were constitutionally sufficient.

The Supreme Court requires courts to consider three factors when determining if procedures are constitutionally sufficient: (1) the private interest to be affected by the action; (2) the risk of erroneous deprivation of that interest through the procedures that were used, and the probable value of added procedures; and (3) the government's interest, including the fiscal and administrative burdens of added procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, the private interest is minimal given the fact that the Vienna Convention is concerned with the rights of nations and not individuals. Furthermore, there is also minimal risk of erroneous deprivation because the State Department is only determining whether a family member has reached twenty-one years of age or is under twenty-three years of age and furthering his education. Added procedures would not aid in determining if a child of a diplomat falls within the State Department's interpretation of the phrase "members of the family." Most important, the government has a strong interest in determining how to implement the Vienna Convention effectively. *See Abdulaziz*, 741 F.2d at 1331. Due process does not require a post-deprivation hearing in this setting.

---

only derivative through the states." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990) (quotation marks omitted). In fact, no court has ever held that the Vienna Convention creates individual rights.

Furthermore, courts looking at a similar treaty, The Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, have found it doubtful that that treaty creates individual rights for violations of consular notification provisions. *Li*, 206 F.3d at 66 (1st Cir. 2000) (stating "it is far from clear that the Vienna Convention [on Consular Relations] confers any rights upon criminal defendants") (citing *Breard v. Greene*, 523 U.S. 371, 377 (1998)). That treaty's preamble, similar to the Vienna Convention of Diplomatic Relations, provides that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts." Preamble to the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 79. Thus, it is far from clear in this context that Al-Hamdi possessed a liberty or property interest in diplomatic immunity.

Al-Hamdi also argues that the State Department should at least provide notice that an individual's immunity has expired, but there is evidence in this case that Al-Hamdi, or at least the Yemeni Embassy, had notice in 1999 that Al-Hamdi's immunity had expired. The Yemeni Embassy requested a new identification card for Al-Hamdi in 1999, but yet neglected to provide the additional information requested by the State Department; consequently, a new card was never issued. Al-Hamdi has also failed to point us to a regulation or statute requiring the State Department to notify persons when their diplomatic status expires. To the contrary, it seems only logical that the obligation to remain aware of one's diplomatic status falls upon the individual wishing to avail himself of the immunity that accompanies diplomatic status. Because the State Department's procedures are constitutionally sufficient, we hold that Al-Hamdi's procedural due process rights were not violated.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*.