**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1730**

EQT GATHERING EQUITY, LLC, a Delaware limited liability
company; EQT PRODUCTION COMPANY, a Pennsylvania
corporation,

Plaintiffs - Appellees,

and

EQUITABLE GATHERING EQUITY, LLC, a Delaware limited
liability company; 70 EQUITABLE PRODUCTION COMPANY, a
Pennsylvania corporation,

Plaintiffs,

v.

FOUNTAIN PLACE, LLC,

Defendant - Appellant.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston. John T. Copenhaver,
Jr., District Judge. (2:09-cv-00069)

Argued: January 30, 2013            Decided: May 21, 2013

Before DAVIS, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** George Lawson Partain, Logan, West Virginia, for
Appellant. David K. Hendrickson, HENDRICKSON & LONG, PLLC,

Charleston, West Virginia, for Appellees.  **ON BRIEF:** Stephen E.
Hastings, HENDRICKSON & LONG, PLLC, Charleston, West Virginia,
for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The parties to this appeal are two property owners, each of whom own certain rights to a tract of land located in Logan County, West Virginia (the "Subject Property"). Appellant Fountain Place, LLC ("Fountain Place") owns the surface rights to the Subject Property. Appellees EQT Gathering Equity, LLC and EQT Production Company (collectively, "EQT") own the oil and gas rights to the Subject Property.

This controversy requires that we determine which of the two property owners must bear the cost of relocating and burying two pipelines on the Subject Property. In answering this question, we apply the analysis set forth by the Supreme Court of Appeals of West Virginia in Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001). We first conclude that EQT, as the owner of the oil and gas rights, was obligated to relocate its pipelines so as not to interfere with the exercise of the rights held by the surface rights owner, Fountain Place. We also conclude, however, that because the parties have not identified a provision in the instruments controlling how the costs of relocating the pipelines in the present dispute are to be apportioned, and the surface rights owner sought to benefit from the change in the status quo by moving dirt to facilitate the exercise of its surface rights, Fountain Place, as the surface

3

rights owner, bears the cost of relocating the two pipelines. Therefore, the judgment of the district court is affirmed.

## I.

The long and winding history of this case has been explored in great detail by the district court and does not warrant further extended discussion here. Accordingly, our recitation of the facts will be limited to only the most relevant matters.

Prior to 1944, Island Creek Coal Company ("Island Creek") was the owner in fee of various tracts of land in Logan County, West Virginia, some of which are now at the center of this dispute.[1]

Over the years, Island Creek, through various instruments, leased certain property rights to other developers. Two such instruments are relevant to this appeal.

## A.

### 1944 Lease

The first instrument relevant here is a 1944 Agreement of Lease (the "1944 Lease"). In the 1944 Lease, Island Creek leased to Columbian Carbon Company and its successors and

---

[1] At oral argument, Appellant indicated Island Creek is still in existence but has not been joined in this lawsuit. Oral Argument at 16:55, EQT Gathering Equity, LLC v. Fountain Place, LLC, (No. 12-1730), available at http://www.ca4.uscourts. gov/OAaudiotop.htm.

assigns, the oil and gas rights to the Subject Property. The 1944 Lease also provided easement rights to the lessee to develop oil and gas operations on the Subject Property. In 1968, Columbian Carbon Company dissolved. By way of a series of transfers and corporate name changes, EQT ultimately acquired Columbian Carbon Company's rights as lessee to the 1944 Lease. Therefore, EQT obtained the oil and gas rights as well as the corresponding easement rights to the Subject Property. The 1944 Lease contains three provisions germane to our discussion here.

The first provision (the "Burying Provision") places certain limitations and obligations on the lessee. The Burying Provision is found in paragraph 8 of the 1944 Lease, and reads:

> [Lessee] shall not drill any well within two hundred (200) feet of any of the principal buildings upon the leased premises. All pipe lines except those used to conduct gas and water for drilling engines shall be buried below plow depth in cultivated land and at a safe depth when crossing under railroads, highways and haulroads. In laying pipe lines [Lessee] shall protect growing crops and fences and if any injury shall be done thereto [Lessee] shall pay for the same as well as any injury or damage caused by any other acts of [Lessee] on the leased premises.

J.A. 68–69.[2]

The second provision (the "Subordination Provision"), found in paragraph 13, indicates that the lessee receives oil

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

and gas rights "subject and subordinate to the business of mining and shipping coal . . . ." J.A. 73.

The third provision (the "Cost Allocation Provision"), found in paragraph 18, provides for the allocation of certain costs among Island Creek and the lessee. Paragraph 18 begins by establishing shared ownership of the oil and gas produced on the Subject Property among Island Creek and the lessee. Paragraph 18 then provides for cost allocation, stating, in relevant part:

> ISLAND CREEK shall, with respect to its sixty-two (62%) per cent. undivided interest therein, pay to [Lessee] sixty-two (62%) per cent. of the total cost of prospecting, drilling and operating for oil and gas on the leased premises under the provisions of this lease . . . and transporting the same on the leased premises including . . . the construction, installing, operating and maintaining on the leased premises of such pipe lines . . . as [Lessee] may deem necessary for such purposes. Included in the total cost shall be an arbitrary charge of six and five-tenths (6.5%) per cent thereof . . . .
>
> Such total cost shall include the cost of performing the obligations of [Lessee] contained in Paragraphs 7, 8, 10, 11, 12 and 15 hereof.

J.A. 77–78.

B.

1965 Deed

The second instrument of relevance here is a 1965 Deed in which Island Creek conveyed to Georgia-Pacific Corporation and its successors and assigns, the surface rights to the Subject Property (the "1965 Deed"). Following a series of

6

conveyances by Georgia-Pacific Corporation and its successors, on February 8, 2001, the rights under the 1965 Deed were sold to Fountain Place.[3]  The 1965 Deed states, in part, that the conveyance is subject to "[t]he right, title and interest of [EQT's predecessor in interest] . . . under agreements of lease dated April 13, 1944," that is, the 1944 Lease.  J.A. 98.

C.

The Pipelines

Pursuant to the 1944 Lease, EQT operates two pipelines on the Subject Property -- both of which, at various points, run across surfaces owned by Fountain Place.  The two pipelines are identified by the following designations: DC-4 and BR-866/1875.

1.

DC-4 Pipeline

By March 1998, Fountain Place's predecessor had deposited an unknown amount of fill dirt over a portion of the DC-4 pipeline.  By November 21, 2001, Fountain Place had also

---

[3] We need not reiterate the chains of title for the 1944 Lease and 1965 Deed, which were exhaustively covered by the district court.  For our purposes, we need only recognize two relevant facts.  First, EQT and Fountain Place possess the rights granted in the 1944 Lease (oil and gas rights) and 1965 Deed (surface rights), respectively. Second, although the parties do not identify precisely when the entity now known as EQT first acquired the oil and gas rights under the 1944 Lease, it is clear EQT acquired such rights prior to Fountain Place's acquisition of the 1965 Deed on February 8, 2001.

deposited an additional unknown amount of fill dirt over the DC-4 pipeline. In total, approximately "30 feet" of fill dirt buried the relevant portion of the DC-4 pipeline. J.A. 518. Following years of negotiation between EQT and Fountain Place over the dirt covering the DC-4 pipeline, EQT unilaterally moved the pipeline to a safer location. The relocation cost EQT $158,141.80.

2.

BR-866/1875 Pipeline

In 2008, Fountain Place desired to install a cellular phone transmission tower on the Subject Property. Fountain Place discovered the BR-866/1875 pipeline ran across the surface of the Subject Property at certain locations -- locations Fountain Place intended to use as pathways to transport materials and equipment for the construction of the cell tower (hereinafter referred to as the "Pathway"). As a result, Fountain Place excavated underneath the BR-866/1875 pipeline. The parties dispute whether the excavation was completed at EQT's direction, or was carried out on Fountain Place's own volition. Nonetheless, it is clear the excavation was precipitated by Fountain Place's desire to traverse the Pathway. According to EQT, the excavation rendered the BR-866/1875

8

pipeline unsafe, and EQT estimated the cost for burying the BR-866/1875 pipeline at the Pathway location to be $45,000.00.[4]

## D.

## Procedural History

On January 26, 2009, EQT filed the present action against Fountain Place in the Southern District of West Virginia. EQT's complaint alleged six causes of action. EQT sought a declaratory judgment holding Fountain Place liable for the cost incurred by EQT for relocating the DC-4 pipeline, an injunction enjoining Fountain Place from further excavating under the BR-866/1875 pipeline, and a declaratory judgment holding Fountain Place liable for the prospective cost of burying the BR-866/1875 pipeline. The complaint also stated tort causes of action for negligence, trespass, and intentional conduct.

In response, Fountain Place filed its answer and a counterclaim against EQT. Fountain Place denied EQT's allegations concerning the DC-4 pipeline, sought an injunction compelling EQT to bury the BR-866/1875 pipeline under Fountain

---

[4] In their Response Brief on appeal, EQT indicated the BR-866/1875 pipeline has since been either relocated or buried at the disputed locations. But EQT did not indicate when this activity occurred or the actual cost.

Place's Pathway, and sought a declaration that EQT was solely responsible for the burial costs.

The parties then filed cross motions for summary judgment with regard to the injunctive and declaratory claims surrounding the BR-866/1875 pipeline.

On March 5, 2010, given that there was no indication Fountain Place would further excavate under the pipeline, the district court dismissed, as moot, the parties' requests for injunctive relief. The district court granted EQT summary judgment on its claim for declaratory relief with respect to the BR-866/1875 pipeline. The district court based its ruling on the principles set forth by the Supreme Court of Appeals of West Virginia in Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001). The district court concluded that because Fountain Place upset the status quo surrounding the BR-866/1875 pipeline, Fountain Place was responsible for paying for the cost of the pipeline's relocation.

On December 14, 2010, Fountain Place filed a motion for summary judgment on EQT's remaining causes of action. EQT responded by filing its own motion for summary judgment on its claim for declaratory relief with respect to the DC-4 pipeline.

On March 3, 2011, the district court denied the parties' cross motions for summary judgment.

10

On November 15, 2011, the case proceeded to trial to resolve questions of fact over when, and by whom, fill dirt was deposited on top of the DC-4 pipeline. The jury returned a verdict indicating Fountain Place and its predecessor were responsible for depositing dirt on top of the DC-4 pipeline.

Following the jury trial, Fountain Place filed a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. In its motion, Fountain Place argued the facts found by the jury indicated that EQT's declaratory action with respect to the DC-4 pipeline and various tort causes of action were barred by West Virginia's applicable statute of limitations.

On March 15, 2012, the district court entered a Memorandum Opinion and Order on Fountain Place's motion for judgment as a matter of law and entered an order of judgment. In its Memorandum Opinion and Order, the district court dismissed EQT's tort claims as time-barred, pursuant to West Virginia's two-year statute of limitations for tortious damage to property. See W. Va. Code § 55-2-12(a). But the district court also concluded EQT's declaratory judgment cause of action with respect to the DC-4 pipeline was not time-barred, because it was subject to West Virginia's 10-year statute of limitations for actions to recover on a contract. See W. Va. Code § 55-2-6. Applying the principles found in Quintain, the district court

11

then upheld the jury verdict in favor of EQT with respect to EQT's request for a declaration that Fountain Place be held responsible for the cost of relocating the DC-4 pipeline.

The district court's judgment order incorporated two of the district court's prior decisions: (1) the March 5, 2010 Memorandum Opinion and Order granting summary judgment in favor of EQT on EQT's claim for declaratory judgment with respect to the BR-866/1875 pipeline; and (2) the March 15, 2012 Memorandum Opinion and Order denying judgment as a matter of law in favor of Fountain Place on EQT's claim for declaratory judgment with respect to the DC-4 pipeline.

Fountain Place then filed a motion to amend the court's Memorandum Opinion and Order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Fountain Place's motion challenged, inter alia, the district court's application of Quintain and West Virginia's 10-year statute of limitations to EQT's declaratory causes of action, in what was essentially a motion for reconsideration. Subsequently, the district court denied Fountain Place's motion to amend.

To summarize, the district court concluded:

- Injunctive relief was unnecessary because the safety and structural integrity of the BR-866/1875 pipeline were no longer in jeopardy;

12

- Fountain Place was responsible for paying the cost of relocating the DC-4 and BR-866/1875 pipelines pursuant to the Supreme Court of Appeals' decision in <u>Quintain</u>;

- EQT's declaratory cause of action with respect to the DC-4 pipeline, requiring Fountain Place to pay for the cost of relocation, was subject to West Virginia's 10-year statute of limitations for actions to recover on a contract, W. Va. Code § 55-2-6, and thus not time-barred;

- EQT's tort causes of action were subject to West Virginia's two-year statute of limitations for tortious damage to property, W. Va. Code § 55-2-12(a), and thus time-barred.

Fountain Place then timely filed the present appeal, largely reiterating the arguments made in its Rule 50 motion. In essence, Fountain Place challenges the district court's declarations that Fountain Place must pay for the cost of relocating the two pipelines.

The district court possessed diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.[5] Additionally, we

---

[5] Fountain Place is a West Virginia limited liability company with its principal place of business in West Virginia. The entities collectively referred to as "EQT" consist of a Delaware limited liability company and a Pennsylvania corporation with their principal place of business in Pennsylvania.

13

possess jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

                                    II.

We review grants of summary judgment and denials of judgment as a matter of law de novo. See PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 119-20 (4th Cir. 2011).

In reviewing a grant of summary judgment, we view all the facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Id. at 119. Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

"A judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." PBM Prods., 639 F.3d at 120 (internal quotation marks omitted).

Because this case comes before us by way of federal diversity jurisdiction, "our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008). "Accordingly, where there is West Virginia law addressing a particular question, we will follow it." Id.

14

III.

In Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001), the Supreme Court of Appeals of West Virginia set forth the framework for courts to follow in resolving disputes such as the one presently before the court.

In Quintain, Columbia Natural Resources, Inc. ("CNR") owned a natural gas pipeline. The pipeline ran over various tracts of land pursuant to right-of-way easements granted by the surface and coal owners of those tracts to CNR's predecessor in interest in 1914. Id. at 97-98. In 1995 and 1996, Quintain Development, LLC ("Quintain") obtained, by a number of leases, the surface mining rights to the various tracts. Id. at 98. In order to exercise its surface mining rights, Quintain brought an action seeking declaratory and injunctive relief against CNR to compel CNR to relocate its pipeline at CNR's expense. Id. at 98-99.

The Supreme Court of Appeals of West Virginia first considered whether CNR, under its right-of-way easements, was obligated to relocate its pipeline to accommodate the surface rights holder. The Supreme Court of Appeals found provisions in the right-of-way easements clearly indicated that the parties had intended the easements would not interfere with the mining of coal, regardless of the mining method employed:

15

> The landowners clearly wished to reserve for themselves the right to remove coal from their respective properties. CNR's predecessor in interest agreed that its pipeline would not interfere with the removal of coal. Clearly the parties contemplated that if the pipeline interfered with the removal of coal, it would be relocated. This fact does not change simply because the method of mining the coal may have changed. The action which the parties contemplated, the possibility of relocating a pipeline that interfered with the mining of coal, remains the same. Consequently, . . . under the right-of-way deeds for the [property at issue], CNR was required to relocate its pipeline from those properties to the extent it interfered with the removal of coal there.

Id. at 101.

Finding CNR obligated to relocate its pipeline, the Supreme Court of Appeals then set about to determine which party was obligated to pay for the cost of relocating the pipeline. Id. at 101. In making this determination, the Supreme Court of Appeals performed a two-part inquiry. First, it turned to the language of the right-of-way easements to determine whether they contemplated who should bear the cost for such relocation. Second, finding the language of the easements silent on the issue, the Supreme Court of Appeals turned to the principle that the party benefiting from the change to the status quo should bear the cost of the change, as espoused in Minard Run Oil Co. v. Pennzoil Co., 419 Pa. 334, 336, 214 A.2d 234, 235 (1965). It is this framework that we apply to the present case.

16

A.

Under Quintain, we begin by asking whether the 1944 Lease obligates EQT to relocate its pipeline to accommodate Fountain Place, the surface rights holder. 556 S.E.2d at 101. We find that it does.

Two provisions in the 1944 Lease reveal an intent by the parties to the 1944 Lease for the operator of the oil and gas pipelines not to interfere with the surface activities on the Subject Property: (1) the Burying Provision; and (2) the Subordination Provision. The Burying Provision reveals a clear intent for the pipelines to be buried and to not interfere with various surface activities, such as farming, means of transportation, and the maintenance of fences. The Subordination Provision also provides that the oil and gas rights holder receives those rights "subject and subordinate to the business of mining and shipping coal . . . ." J.A. 73. From these two provisions, it is a short inferential step to conclude the oil and gas rights granted to Columbian Carbon Company, and thus to EQT, were intended not to interfere with the surface rights of Island Creek and its assigns, that is, Fountain Place. Accordingly, EQT is obligated to relocate its pipelines to the extent they interfere with Fountain Place's exercise of its surface rights.

17

B.

Under the next step in the Quintain analysis, we must now determine which party is obligated to pay for the cost of the pipeline relocation.  556 S.E.2d at 101.

1.

As the Quintain framework dictates, we first turn to the language of the 1944 Lease.  See id.; see also Equitable Gathering Equity, LLC v. Dynamic Energy, Inc., No. 5:07-cv-00725, 2009 WL 37186, at *3 (S.D.W. Va. Jan. 7, 2009) ("First, as in Quintain, the granting instruments in the instant case state that the coal estate is to be the dominant estate, but are silent regarding who should bear the cost of relocating the pipelines.").

Fountain Place argues that the affirmative command given the oil and gas rights owner in the Burying Provision implicitly requires EQT to bear the cost of relocating its pipelines.  See Appellant's Br. 29 ("[T]he District Court's legal conclusion that the [1944 Lease] does not contain a cost shifting provision . . . is manifestly at odds with the specific provision in the lease that the Lessee 'shall' bury all pipelines under 'haulroads.'").  As noted above, the Burying Provision places an obligation on EQT to bury its pipelines to the extent they interfere with the exercise of surface rights by the surface rights owner.  The Burying Provision is silent,

18

however, as to how the costs of complying with such obligations should be apportioned between the oil and gas rights owner and any subsequent surface rights owner.[6]

Accordingly, because the parties have not identified a provision in the instruments controlling how the costs of relocating the pipelines in the present dispute are to be apportioned, we must continue to the next step in the Quintain analysis.

2.

Given that the parties have not invoked any controlling provision under the relevant instruments to resolve this dispute, pursuant to Quintain we must impose the cost of relocating the DC-4 pipeline and burying the BR-866/1875 pipeline on the party who desired to alter the status quo for its own benefit. See 556 S.E.2d at 101. Here, the DC-4 and BR-

---

[6] Fountain Place did not argue below in the district court, in brief on appeal, or at oral argument that the Cost Allocation Provision applies to the present dispute. See J.A. 398 ("Fountain Place has identified no provision in the [1944 Lease] or elsewhere in the chain of title that would impose upon plaintiffs the relocation or burial costs."). We therefore consider any such argument waived. See Corti v. Storage Tech. Corp., 304 F.3d 336, 343 (4th Cir. 2002) (Niemeyer, J., concurring) (collecting cases illustrating that "when a party to a civil action fails to raise a point at trial, that party waives review of the issue unless there are exceptional or extraordinary circumstances justifying review"); United States v. Al-Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

866/1875 pipelines were in existence when Fountain Place purchased the surface rights under the 1965 Deed in 2001. Therefore, the initial act of placing the pipelines could not have altered the status quo as between the parties. The question then becomes whether subsequent acts, such as the placement or removal of dirt, altered the status quo for the benefit of one of the parties.[7]

a.

DC-4 Pipeline

With respect to the DC-4 pipeline, the jury found Fountain Place deposited fill dirt on top of the DC-4 pipeline as late as November 21, 2001. Fountain Place sought to alter the status quo for its own benefit -- Fountain Place sought to change the nature of the Subject Property where the DC-4 pipeline was located in order to conduct its own surface activities in that area. Although there were incidental benefits to both EQT and Fountain Place in safely moving the DC-4 pipeline away from Fountain Place's surface activities and

_____

[7] Upon review, we agree with the district court's conclusion that Fountain Place's evidence that EQT may have first moved the BR-866/1875 pipeline was too speculative, incomplete, and contradictory to create a genuine dispute of material fact. J.A. 395-96 n.14 ("Fountain Place has failed, as a matter of law, to offer more than a scintilla of evidence that the disputed pipeline section was moved at any time following its original placement, whenever that may have occurred.").

20

alleviating the danger created by Fountain Place, it is Fountain Place who directly benefitted from the change in the status quo. Accordingly, the district court correctly concluded that Fountain Place must bear the cost of the relocation of the DC-4 pipeline.

## b.

### BR-866/1875 Pipeline

With respect to the BR-866/1875 pipeline, our conclusion is the same. Even if, as Fountain Place claims, EQT replaced portions of the BR-866/1875 pipeline in 2001, and again in 2007, after Fountain Place purchased the surface rights under the 1965 Deed on February 8, 2001, Fountain Place did not seek to use the Pathways over which the BR-866/1875 pipeline ran for the construction of a cell tower until 2008. The pre-2008 status quo was entirely sufficient for EQT. Rather, it was Fountain Place who sought the change in the status quo by excavating under the BR-866/1875 pipeline in order to install a cell tower. Accordingly, the district court correctly concluded that Fountain Place must bear the cost of the burial of the BR-866/1875 pipeline.

## IV.

In sum, we find that under the 1944 Lease, EQT is obligated to relocate its pipelines to the extent they interfere with Fountain Place's proper exercise of its surface rights

21

under the 1965 Deed.  Fountain Place, however, was aware or should have been aware of the DC-4 and BR-866/1875 pipelines when it purchased its surface rights in 2001.  After its purchase in 2001, Fountain Place sought to alter the status quo, and benefit from the change in circumstances.  Thus, in accordance with Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001), Fountain Place must bear the concomitant costs of relocating the pipelines.[8]

Therefore, the judgment of the district court is

AFFIRMED.

---

[8] We have considered each of the other issues raised by the parties in this case on appeal and find them to be without merit.

22