**UNITED STATES of America,**
**Appellant,**

v.

**Penyu Baychev KOSTADINOV,**
**Defendant-Appellee.**

**No. 1133, Dockets 84–1042, 84–1092.**

United States Court of Appeals,
Second Circuit.

Argued April 11, 1984.

Decided May 10, 1984.

Ruth Glushien Wedgwood, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., Paul Shechtman, Asst. U.S. Atty., New York City, of counsel), for appellant.

Martin Popper, New York City (John Mage, Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel), for defendant-appellee.

Before TIMBERS and PRATT, Circuit Judges, and METZNER, District Judge.[*]

METZNER, District Judge:

The United States appeals from an order of the United States District Court for the Southern District of New York, Vincent L. Broderick, Judge, dismissing an espionage indictment against the appellee on the ground that the defendant is fully immune from the criminal jurisdiction of the United States by virtue of diplomatic immunity. Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95, and 22 U.S.C. § 254d (1982) (Convention). For the reasons stated below, we reverse.

I. *The facts leading to this appeal*

Appellee, Penyu Baychev Kostadinov, is an employee of the Bulgarian Ministry of Foreign Trade, and serves as an assistant commercial counselor in that country's New York trade office. With the permission of the United States, the Bulgarian Legation (later Embassy) in Washington opened the New York office in 1963 for the purpose of promoting trade between the two countries. Bulgaria designated a commercial counselor to head up this office, and he was specifically granted diplomatic immunity by the United States Government. This government recognizes the premises housing the New York office as part of the premises of the Bulgarian Embassy in Washington.

The record reflects that on September 23, 1983, Kostadinov met with another individual in a restaurant in Manhattan. There he purchased from that individual a secret document entitled "Report on Inspection of Nevada Operations Office," which concerned various security procedures for American nuclear weapons. At that meeting Kostadinov paid the individual $300, arranged to meet the person again to make further payment, and gave the person a list of thirty additional classified documents which Kostadinov wanted to acquire. Unbeknown to Kostadinov, the individual had been providing information to the Federal Bureau of Investigation, whose agents recorded the meeting on audio and videotape. FBI agents arrested Kostadinov as he left the meeting. He subsequently was indicted on one count of attempted espionage, 18 U.S.C. § 794(a) (1982), and one count of conspiracy to commit espionage, 18 U.S.C. § 794(c) (1982).

Kostadinov moved before Judge Broderick to dismiss the indictment, claiming that he had diplomatic immunity from criminal prosecution under the provisions of the Convention. Judge Broderick granted Kostadinov's motion, finding that since the New York trade office at which Kostadinov worked was a part of the Bulgarian Embassy, the title "assistant commercial counselor" makes him a member of the staff of the "embassy"[1] as defined by the Convention, entitling him to immunity.[2]

II. *The Vienna Convention*

A. *Provisions and history*

The sole issue on this appeal is whether, under the provisions of the Convention, approved by the Senate in 1965 and ultimately ratified by this country in 1972, as well as 22 U.S.C. § 254d, Kostadinov was a

---

[*] Hon. Charles M. Metzner, of the United States District Court for the Southern District of New York, sitting by designation.

1. The court below used the word "embassy," which is the term generally used. However, the Convention refers only to "mission" which will be used in this opinion.

2. Kostadinov relies on an opinion by Judge Lasker who previously adopted similar reasoning, in a civil setting. *Vulcan Iron Works v. Polish American Machinery Corp.*, 472 F.Supp. 77 (S.D.N.Y.), *rev'd on other grounds on reconsideration*, 479 F.Supp. 1060 (S.D.N.Y.1979).

member of the Bulgarian mission immune from criminal prosecution in this country. It appears that prior to the Convention there would be no question as to the power of the United States to deny diplomatic immunity to Kostadinov. Section 254d provides that an indictment against an individual protected by. the Convention shall be dismissed.

Under the Convention, diplomatic privileges and immunities are determined with reference to a country's "mission" abroad, but nowhere does the Convention expressly define the term "mission." Article 1 does define the "members of the mission" as "the head of the mission and the members of the staff of the mission," which includes "the diplomatic staff . . . the administrative and technical staff and . . . the service staff of the mission . . . ." The "administrative and technical staff," in turn, is defined as "the members of the staff of the mission employed in the administrative and technical service of the mission . . . ." It is to this group that Kostadinov claims to belong, and indeed, Article 3 lists one of the functions of a diplomatic mission as "developing" the "economic" relations between the sending and receiving states.[3]

Article 7 provides, in pertinent part, that subject to Articles 9 and 11, "the sending State may freely appoint the members of the staff of the mission." Article 9 states that:

"1. The receiving State may at any time and without having to explain its decision, notify the sending State that the head of the mission or any member of the diplomatic staff of the mission is *persona non grata* or that any other member of the staff of the mission is not acceptable. In any such case, the sending State shall, as appropriate, either recall the person concerned or terminate his functions with the mission. A person may be declared *non grata* or not acceptable before arriving in the territory of the receiving State.

2. If the sending State refuses or fails within a reasonable period to carry out its obligations under paragraph 1 of this Article, the receiving State may refuse to recognize the person concerned as a member of the mission."

Article 11 provides that:

"1. In the absence of the specific agreement as to the size of the mission, the receiving State may require that the size of a mission be kept within limits considered by it to be reasonable and normal, having regard to circumstances and conditions in the receiving State and to the needs of the particular mission.

2. The receiving State may equally, within similar bounds and on a non-discriminatory basis, refuse to accept officials of a particular category."

The above provisions are better understood after examining the groundwork performed by the International Law Commission (Commission) and the discussions by the delegates to the Vienna Conference which prepared the Convention.

---

3. In its 1958 discussion of draft Article 3 (later adopted in virtually identical form as final Article 3), the International Law Commission recognized that nations often sent abroad commercial representatives whose entitlement to diplomatic immunities varied from country to country. The rapporteur had proposed a commentary stating in part that "[a]n overlapping of functions may easily occur in the course of co-operation between the trade delegations and the diplomatic mission, which will make it difficult to determine whether the trade delegation or its members have been notified as belonging rightly to the mission." The draft commentary also observed that the subject of trade representatives was not suitable for treatment "by general provisions," but was more appropriately cover-

ed by "commercial treaties." *Summary Records of the International Law Commission*, [1958] 1 Y.B. Int'l L.Comm'n 110.

After heated debate over the proper status of trade representatives, reflecting the fact that various nations treated them differently, *Summary Records* at 110–11, 235, the Commission adopted a simple commentary. It wrote that "[w]ith regard to trade missions, it should be noted that the question of commercial representation as such—i.e., apart from the commercial attachés of a diplomatic mission—is not dealt with in the draft because it is usually governed by bilateral agreement." *Report of the International Law Commission to the General Assembly*, [1958] 2 Y.B. Int'l L.Comm'n 90.

In 1954 the Commission, an agency of the United Nations, initiated work on the subject, and appointed a "special rapporteur" to prepare a set of draft articles, with a commentary. In 1957 the Commission adopted a provisional set of articles, with an official commentary, and submitted its work to the Secretary-General of the United Nations, with a request that he transmit them to constituent governments for their observations. The General Assembly's Sixth Committee also reviewed the draft.

In 1958, after having received various comments in response to its 1957 draft, the Commission adopted draft articles and the rapporteur's commentary, and forwarded its work to the General Assembly with a recommendation that U.N. member states conclude an international convention based upon the draft. *See generally Report of the International Law Commission to the General Assembly,* [1958] 2 Y.B. Int'l L.Comm'n 89 *(Report)*, and sources cited therein.

In 1959 the General Assembly requested the Secretary-General to convene a conference in Vienna by the spring of 1961, in order to prepare a convention on diplomatic intercourse and immunities. The Assembly specifically referred to the Vienna Conference the Commission's 1958 report, comprising both the draft articles and the rapporteur's commentary, "as the basis for its consideration of the question of diplomatic intercourse and immunities." G.A.Res. 1450(XIV), 7 December 1959.

The Vienna Conference met and produced the Vienna Convention on Diplomatic Relations.

The background material illuminates what we believe to have been a misconception by the district court of the meaning of the term "mission" in the Convention. The court placed emphasis on the physical aspect of a "mission." Under the Convention, a "mission" consists of a group of people sent by one state to another; it does not refer to the premises which they occupy in the receiving state. This is made clear by the rapporteur's commentary to Article 6 of the Commission's draft, which

was later adopted as Article 7 of the Convention. In his commentary to that draft article the rapporteur wrote:

"While it is the sending State which appoints *the persons who comprise the mission,* the choice of these persons ... may considerably affect relations between the States, and it is clearly in the interests of both States that the mission should not contain members whom the receiving State finds unacceptable."

*Report* at 91 (emphasis added). In a similar fashion, the commentary to draft Article 10 (final 11) observes that one of the "questions connected with the mission's composition which may cause difficulty" is "that of the choice of *the persons comprising the mission.*" Report at 92 (emphasis added).

In the general commentary to the draft articles, the rapporteur stated that diplomatic privileges and immunities may be divided into three groups: "(a) Those relating to the premises of the mission and its archives; (b) Those relating to the work of the mission; (c) Personal privileges and immunities." *Report* at 94–95. In this case we are concerned with (c).

Draft Article 19 (final 21) speaks of the receiving state's obligation to assist the sending state to acquire the "premises necessary for its mission," and the rapporteur's commentary again draws the distinction between the mission and the physical premises which it uses, speaking of potential problems rendering it difficult "for a mission to acquire the premises necessary to it." *Report* at 95. Draft Article 20 (final 22) delineates the immunity which attaches to the premises of a mission, which are expressly defined by the rapporteur as including "the buildings or parts of buildings used for the purposes of the mission, whether they are owned by the sending State or by a third party acting for its account, or are leased or rented"; the premises are used "as the headquarters of the mission." *Report* at 95. Draft Article 43 (final 45) observes that while a *mission* may be recalled, the receiving state must "protect the premises of the mission," or

the sending state "may entrust the custody of the premises of the mission" to a third state.

One objection might be raised to the interpretation differentiating between mission and premises, based upon the final text of Article 12. The original draft required the sending state to obtain the permission of the receiving state before establishing "offices in towns other than those in which the mission itself is established." The final text required permission to establish "offices forming part of the mission in localities other than those in which the mission itself is established." At first blush this article appears to be an isolated reference to physical structures as comprising a "mission," despite the many clear statements to the contrary elsewhere in the Convention and the commentary.

Here again, the rapporteur's commentary clarifies the intent of the article which was "included to forestall the awkward situation which would result for the receiving Government if *mission premises* were established in towns other than that which is the seat of the Government." Report at 92 (emphasis added). The original draft of this article clearly adopted the consistently accepted view that a "mission" is composed of people, and premises are where missions are housed.

The change in language between the draft and the final text was not intended to alter the purpose set forth by the rapporteur. The records of the Vienna Conference demonstrate that the additional words were inserted to make it clear that such offices were to be physically inviolable to the same extent as the mission's primary premises. However, this does not confer diplomatic immunity on those who work there.

In addition, the delegates rejected the use of the all-inclusive term "premises" in this section in order to make it clear that no consent was required for the establishment, for example, of summer residences or homes outside the boundaries of the capital.[4]

In its report to the Secretary of State, the United States delegation to the Vienna Conference observed that Article 12 reflected "[p]resent international practice."[5] The United States declared in 1939 that "the only foreign diplomatic officers ... permitted to reside and maintain offices in New York City will be the ranking commercial or financial officer,"[6] and it has continuously followed that policy.

Finally, the Senate subcommittee considering the Convention was informed by the State Department that the Convention would apply to the "diplomats in Washington, and those in New York at the United Nations and also those attached to the OAS and to the NATO headquarters who have diplomatic status [all of whom] number about 3,000 in this country, roughly,"[7]

4. See *Official Records of the United Nations Conference on Diplomatic Intercourse and Immunities, Vienna,* 2 March-14 April 1961 (Geneva 1962) 108–12 (remarks of the delegates of the United Kingdom and Turkey; remarks of the delegate of Cuba, observing that a diplomatic mission might establish offices *not* forming part of the mission).

The records of the International Law Commission's consideration and adoption of the draft article and commentary reflect similar concerns. *Summary Records, supra* note 2, at 113–14, 239–40.

5. *United States Delegation to the United Nations Conference on Diplomatic Intercourse and Immunities, Report to the Secretary of State,* Dep't of State Pub. No. 7289 (1962). A position paper of the United States delegation to the Vienna Conference noted the American policy of declining to accredit subordinate trade office em-

ployees not resident in Washington, and did not indicate that the Convention would alter that practice. 7 Whiteman, *Digest of International Law* 9 (1970).

6. *Letter from George T. Summerlin, Chief of Protocol of the State Department, to the Belgian Ambassador to the United States* (November 4, 1939).

7. *Vienna Convention on Diplomatic Relations: Hearing Before the Subcommittee of the Senate Committee on Foreign Relations,* 89th Cong., 1st Sess. 22 (1965) (statement of Leonard C. Meeker, State Department Chief Legal Adviser). At the same time the subcommittee was informed that the text of Article 11, permitting a receiving state to limit the size and categories of staff in sending states' missions, would not change current United States practice. *Id.* at table (list of Convention provisions and their effects, if any, on United States law).

The subcommittee was further informed that the Convention would not apply to trade office personnel.[8]

### B. *The location of one's office in mission premises does not necessarily carry with it diplomatic status.*

Kostadinov argues that he is a "member of the staff of the mission" under the Convention, for he works in the New York trade office, which is housed in mission premises. Since mission premises and the mission itself are independent concepts, however, it does not follow that his working in mission premises requires the conclusion that Kostadinov is a member of the mission.

The members of the Commission and the delegates to the Vienna Conference recognized that under existing international law persons sent by a foreign nation to perform consular duties may maintain offices upon mission premises, but not be members of the mission itself.[9] The delegates demonstrated their clear aversion to conferring diplomatic status upon purely consular officials even when those officials maintained offices on mission premises. The delegates from Brazil, for example, observed that consular sections on mission premises operated as consulates, not as parts of the missions, and that consular personnel often remain behind when their nation's diplomatic missions are recalled. *Official Records of the United Nations Conference on Diplomatic Intercourse and Immunities, Vienna, 2 March-14 April 1961* (Geneva 1962) 82 (*Conference*). In a statement echoed by several other nations' delegates, the Yugoslavian delegate added that

while most countries would tolerate the performance of some consular functions on the premises of diplomatic missions, the entire subject of consular relations was outside the scope of that conference on diplomatic immunities. *Conference* at 82–83 (*e.g.*, remarks of delegates of Viet-Nam and Argentina). Ultimately, a separate convention was prepared to regulate consular relations, the Vienna Convention on Consular Relations, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261.

The Commission specifically discussed another instance in which a person employed and working on mission premises nonetheless would not be entitled to be considered a "member of the staff of the mission," and, of course, would not enjoy diplomatic privileges and immunities. Article 9 provides that a receiving state may declare "at any time" that any member of the staff of a mission is not acceptable, in which case the sending state shall "recall the person concerned or terminate his functions with the mission." Should the sending state refuse or fail within a reasonable period to do so, "the receiving State may refuse to recognize the person concerned as a member of the mission."

In the commentary to the draft of this article, the rapporteur observed that should the sending state fail to fulfill its obligations concerning an unacceptable member, the receiving state "may take action of its own accord. It may declare that the functions of the person concerned are terminated, that he is no longer recognized as a member of the mission, and that he has ceased to enjoy diplomatic privileges." *Re-*

---

**8.** *Id.* at 74. With this understanding, in his report to the Senate recommending approval of the Convention, Senator Church wrote:

"Since there are a great many more foreign official representatives in the United States than those attached to permanent diplomatic missions accredited to the Government of the United States, the committee received assurances that the Vienna convention applied only to the latter group. Members of trade missions and other negotiating groups ... are not within the scope of this convention. It is strictly limited to the permanent diplomatic

missions maintained by foreign governments at the seat of other foreign governments." *Ex.Rep. No. 6*, 89th Cong., 1st Sess. 10 (1965).

**9.** *See also Restatement of the Foreign Relations Law of the United States* Title B (tent. Draft No. 4, 1983), intro. note at 23n (observing that foreign officials may be sent abroad for various purposes, "and may have offices at a diplomatic mission ... but the status of such persons, and their privileges and immunities, must be determined in each case in the light of the agreement between the two states, and is not determined by their title or designation.").

*port* at 91. The delegates at Vienna shared this understanding of the article. *See, e.g., Conference* at 102 (remarks of the delegates of India, Iraq and the U.S.S.R.).[10] Thus, if the sending state refuses to act on the receiving state's objections within a reasonable time, the person concerned loses any diplomatic privileges and immunities which he may once have had, and this is so regardless of whether he continues to be employed by the mission and is provided office space on its premises. Nothing in the convention requires that the receiving state must either expel the person concerned or accept him as a member of the mission.

▇ The mere fact that Kostadinov's office is located in a building in New York which is considered part of the Bulgarian Embassy does not, without more, establish that he is one of the persons who comprise the Bulgarian mission to the United States. Accordingly, we now examine whether pursuant to the terms of the Convention, Kostadinov in particular enjoys diplomatic immunity.

## C. *Is Kostadinov a member of the mission?*

During the course of the discussions in Vienna, the Indonesian delegate remarked that it was not the Conference's intent to afford diplomatic status to all persons holding diplomatic passports in cases where the receiving state did not approve. *Conference* at 56. The State Department has consistently refused to recognize "assistant commercial counselors" as having diplomatic immunity and has so notified Bulgaria.

The United States recognizes that New York City is the proper place for offices engaged in expanding trade between foreign countries and the United States. Diplomatic missions to the United States are confined to Washington, D.C. The only

exception to the requirement that members of the diplomatic mission reside and work in Washington is that the commercial counselor may also head up the New York trade office and reside in New York. Of course, the counselor may employ other persons from his country to assist in conducting the work of the office, but it does not follow that such persons are members of the diplomatic mission.

In the negotiations between Bulgaria and the United States in 1963 regarding settlement of financial claims, the subject of improving trade between the countries was discussed. The settlement of the claims was contained in a written agreement. Bulgaria requested insertion of language in the agreement regarding trade between the countries, but the United States insisted on keeping the issues separate. The subject of trade relationships was merely contained in a press release issued by the United States which stated:

> "The United States is prepared to authorize the Legation of the People's Republic of Bulgaria to establish in New York a commercial office which would have the purpose of promoting trade between our two countries. Both Governments will be prepared to facilitate the travel of commercial representatives and officials interested in increasing trade." [11]

Shortly after the issuance of this press release, the director of the State Department's Office for East European Affairs informed the Bulgarian Minister in Washington that only the Bulgarian Commercial Counselor in Washington, who would also head the New York office, would be entitled to diplomatic immunity. He further stated that immunity would not be provided for anyone else employed at the New York trade office. This message was repeated

---

10. *See, e.g.,* the 1958 *Summary Records, supra* note 3, at 237–38; and the 1957 Commission proceedings, *Summary Records of the International Law Commission,* [1957] 1 Y.B. Int'l L.Comm'n 201–02, 225.

11. Department of State, *For the Press,* No. 355 (July 2, 1963).

on March 11, 1964, to the First Secretary of the Bulgarian Legation in Washington.[12]

This policy takes on added meaning in this case when we consider the discussions with regard to commercial representation by the Commission. It is perfectly clear that commercial representation is not covered by the Convention.[13] Kostadinov asserts that the press release constitutes a "Bi-Lateral Agreement" which makes him a commercial attache with diplomatic immunity. Certainly a press release is not a bi-lateral agreement.

The State Department again reminded Bulgaria of its policy regarding New York trade missions on April 25, 1973, in denying the request by the Bulgarian Embassy in Washington for diplomatic license plates for newly arrived trade representatives in New York.[14]

Thrice in the next five years, in 1974,[15] 1977[16] and 1978,[17] the State Department sent circular notes to the chief diplomatic officer of each Washington embassy restating the longstanding United States policy that all mission personnel entitled to diplomatic privileges and immunities, with the exception of the senior financial, economic and commercial officers in New York, must reside in the Washington area.

In May, 1979, Bulgaria notified the United States that it was sending Kostadinov "in the commercial service of the Embassy of the Peoples' Republic of Bulgaria in Washington" to replace Stefan Kossev. Kossev was an assistant commercial counselor in New York City. At that time Bulgaria knew that Kostadinov would not be accepted by the United States as a member of the mission. Although the United States did not formally notify Bulgaria that Kostadinov was "not acceptable," the whole course of conduct prior to his arrival and thereafter made it abundantly clear that the United States did not consider any person sent by any country with such assignment acceptable as a member of a mission.

This government issued an A–2 visa to Kostadinov. Such a visa does not necessarily confer diplomatic immunity. *See* 8 U.S.C. § 1101(a)(15)(A)(i), (ii) (1982); 22 C.F.R. § 41.12 (1983). This exchange of documents did not constitute a withdrawal by the United States of its understood policy regarding officers of a trade mission in New York. They did not constitute an acceptance of Kostadinov as a member of the Bulgarian diplomatic mission entitled to immunity.

Subsequent to his arrival, Kostadinov never received a diplomatic identity card and his name never appeared on the blue or white lists prepared by this government which indicate that a person has diplomatic immunity. He worked in the trade office in New York City.

In January 1981 the State Department restated its position to the Bulgarian Embassy in connection with Mirolyub Vulov, who had been assigned to the Bulgarian

12. Department of State, Memorandum of Conversation among Messrs. Vedeler, White and Molerov, March 11, 1964.

13. *See supra* note 3.

14. The letter read as follows:
    "As you know, it is the policy of the Department of State to accept for inclusion in the Department's 'Diplomatic List' only the officer-in-charge of an Embassy Commercial or Financial Office in New York. It is the general practice under such circumstances, since only that officer enjoys privileges and immunities, to issue only three sets of DPL license plates; one for the official vehicle, one for the automobile of the diplomatic officer and one for that of his wife.

    In view of the foregoing, I regret that it will not be possible to authorize the issuance of DPL license plates for automobiles of other personnel of the office of the Commercial Office of the Bulgarian Embassy in New York."
    *Letter from State Department Assistant Chief of Protocol to Second Secretary of Bulgarian Embassy,* April 25, 1973.

15. *Reprinted in* Department of State, Office of the Legal Adviser, *Digest of United States Practice in International Law 1974* at 157–58.

16. *Reprinted in* Department of State, Office of the Legal Adviser, *Digest of United States Practice in International Law 1978* at 536–37.

17. *Id.* at 532–36.

trade office in New York.[18] In April 1981, in another context, the Bulgarian Commercial Counselor was again advised of the position of the United States.[19] On May 29, 1981, an official of the Bulgarian Ministry of Foreign Affairs met with representatives of the United States Embassy in Sofia and specifically referred to the fact that the United States did not accord its subordinate New York trade officers diplomatic privileges and immunities.[20]

As noted above, in the absence of a specific agreement as to the size of the mission, Article 11 permits the receiving state to "require that the size of a mission be kept within limits considered by it to be reasonable and normal" with regard to conditions in the receiving state and the needs of the mission concerned.[21] That article also permits the receiving state, on a nondiscriminatory basis, to "refuse to accept officials of a particular category."

The United States did precisely what Article 11 permits. It limited the size of the Bulgarian mission by refusing to accept as members of that mission officials of a certain category, namely, assistant commercial counselors based in New York. Furthermore, it did so on a nondiscriminatory basis.

### III. Conclusion

■ This court concludes that Kostadinov is not a member of the Bulgarian mission entitled to immunity from criminal

prosecution. The order dismissing the indictment is reversed and the indictment reinstated.

An appeal was subsequently filed by the government from an order of Judge Broderick granting Kostadinov habeas corpus relief. That order was stayed pending appeal and the appeal was consolidated with the appeal on the merits. However, the matter was never briefed nor argued on the appeal from the dismissal of the indictment. This second appeal is dismissed as moot.

**18.** *See Cable from State Department to United States Embassy in Sofia,* January 31, 1981.

**19.** The Bulgarians were told that:

"Bulgarian officials assigned to the United States Receive A visas, but that the visa itself did not confer diplomatic status or immunity. As a matter of policy, diplomatic missions were required to be located in the District of Columbia ... to prevent a proliferation of offices and persons with diplomatic status around the country. [The State Department officer] said a number of countries, including Bulgaria, had been permitted to have one officer from the Embassy with diplomatic status resident in New York on an exceptional basis because of that city's commercial significance. None of the other personnel assigned to New York by Bulgaria or by other countries with similar offices were accredited as diplomatic staff or accorded privileges and

immunities under the Vienna Convention. [The officer] said they fell in the category of 'miscellaneous foreign government 'officials' who were entitled only to relief from paying U.S. federal income taxes."

*Cable from State Department to United States Embassy in Sofia,* April 15, 1981.

**20.** *See Cable from United States Embassy in Sofia to State Department,* May 29, 1981.

**21.** The Commission's draft had set up an objective standard of "reasonable and normal" for a mission's size. The delegates at Vienna rejected that standard, and granted the receiving state the right to limit the size of missions to the number *it* considered reasonable and normal. *Conference* 106–08 (committee records), 13–4 (plenary session adopting the article). *See* Kerley, *Some Aspects of the Vienna Conference on Diplomatic Intercourse and Immunities,* 56 Am.J. Int'l L. 88, 98–99 (1962).