**UNITED STATES of America,**

v.

**Vladimir KUZNETSOV, Defendant.**

**No. 05 CR. 916(DAB).**

United States District Court,
S.D. New York.

July 24, 2006.

Marion A. Seltzer, New York, NY, Steven Gary Kobre & Kim LLP, New York, NY, for Defendant, Vladmir Kuznetsov.

Edward O'Callaghan, Mary Jo White, New York, NY, Michael E. Farbiarz, Stephen Aaron Miller, Michael A. Levy, U.S. Attorney's Office, New York, NY. for Plaintiff, U.S.

## MEMORANDUM & ORDER

BATTS, District Judge.

Before the Court is Defendant Vladimir Kuznetsov's Motion to Dismiss the Indictment on the grounds that he is entitled to full diplomatic immunity under the Vienna Convention on Diplomatic Relations and the United Nations Convention on Privileges and Immunities. In the event that the Court does not dismiss the Indictment, Defendant requests an evidentiary hearing to determine the suppression of post-arrest statements made by Defendant.

For the reasons that follow, Defendant's Motions are DENIED.

## I. BACKGROUND

The Indictment against Defendant, which charges him with one count of conspiracy to commit money laundering, was unsealed on September 1, 2005. According to the Indictment, from at least mid–1985, a co-conspirator not named as a defendant in the Indictment ("CC–1"), who worked as a procurement officer at the United Nations ("UN") in Manhattan, established an off-shore account to facilitate illicit and secret payments to him by foreign companies seeking to secure UN contracts. (Indictment ¶ 1.) Defendant was employed by the UN from 2000 to 2005. From 2000 to on or about December 31, 2003, he served as a member of the Advisory Committee on Administrative and Budgetary Questions ("ACABQ"), a subsidiary organ of the UN General Assembly, and from January 1, 2004 to in or about August, 2005, he served as Chairman of that Committee. (Id. ¶ 2.)

The Indictment alleges that in or about early 2000, CC–1 informed Defendant of his use of an off-shore account to collect secret payments from foreign companies. Instead of reporting CC–1's conduct to law enforcement authorities, Defendant allegedly agreed with CC–1 that CC–1 would transfer a share of the proceeds from this scheme to Defendant for his own benefit. (Id. ¶ 3.) The Indictment alleges that in or about 2000, Defendant established his own off-shore company, Nikal, Ltd., to facilitate and hide the proceeds received from CC–1. For this purpose, Defendant opened a bank account in the name of Nikal, Ltd. at Antigua Overseas Bank Limited. This bank was the same bank where CC–1 had opened an account in the name of his off-shore company. (Id. ¶ 4.) From in or about 2000 to June, 2005, CC–1 allegedly transferred hundreds of thousands of dollars in criminal proceeds to Defendant. (Id.)

On September 1, 2005, the Government obtained a waiver of privileges and immunities of Defendant from UN Secretary–General Kofi Annan, under Article V of the Convention to the Chairman of the ACABQ. (Def.'s Mem. Law at Ex. E.) On the same day, federal agents arrested Defendant.

## II. DISCUSSION

Defendant moves to dismiss the Indictment on the basis that he is exempt from the criminal jurisdiction of the United States. If the Court finds that he is not

exempt, Defendant requests an evidentiary hearing to determine whether his post-arrest statements were taken in violation of his constitutional rights.

## A. Immunity

Defendant states that he is exempt from this Court's jurisdiction because he is a "diplomatic agent" and because he is an official of the Russian Federation visiting the UN.

■ A court must consider a defendant's diplomatic status at the time of his arrest when determining the issue of diplomatic immunity. *United States v. Al–Hamdi*, 356 F.3d 564, 569 (4th Cir.2004).

### 1. Diplomatic Agent

The Defendant claims that he is entitled to diplomatic immunity as a "diplomatic agent" under the Vienna Convention on Diplomatic Relations ("Vienna Convention").[1]

Article 31 of the Vienna Convention provides that "a diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." 23 U.S.T. 3227, art. 31(1). The United States has enacted a corresponding provision that states that "any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention of Diplomatic Relations ... shall be dismissed." 22 U.S.C. § 254d. Article 1(e) of the Vienna Convention defines a "diplomatic agent" as "the head of the mission ... charged by the sending state with the duty of acting in that capacity." 23 U.S.T. 3227, art. 1(e).

Under the Vienna Convention, "diplomatic privileges and immunities are determined with reference to a country's 'mission' abroad." *United States v. Kostadinov*, 734 F.2d 905, 907 (2d Cir.1984), *cert. denied*, 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984). Although the Vienna Convention does not expressly define "mission," it provides the functions of a diplomatic mission, which include:

(a) representing the sending state in the receiving State;

(b) protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) negotiating with the Government of the receiving state;

(d) ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

23 U.S.T. 3227, art. 3(1). Article 4(1) of the Convention provides that "The sending State must make certain that the agreement of the receiving State has been given for the person it proposes to accredit as head of the mission to that State." 23 U.S.T. 3227, art. 4(1).

The Defendant claims that the services he performed as the Head of the Division of the Russian Ministry of Foreign Affairs ("MFA"), and as a member of the Russian delegation to the Geneva Group[2] qualify

---

1. The United States ratified the Vienna Convention on Diplomatic Relations on December 13, 1972. *See* Office of the Legal Advisor, U.S. Department of State, *Treaties in Force: A List of Treaties and Other Agreements of the United States in Force on January 1, 1991.*

2. The Defendant and Government disagree as to the exact status of the Geneva Group within the framework of the United Nations. They both agree, however, that the Geneva Group consists of representatives from several foreign countries who meet to discuss budget-

him as a diplomatic agent under the Vienna Convention.

In support of this contention, Defendant has submitted two letters from the Permanent Mission of the Russian Federation to the United Nations ("Russian Mission") which state that Defendant is a "Russian career diplomatic agent" performing functions on behalf of the MFA from 1986 to the present time. (Def.'s Mem. Law at Ex. A; Def.'s Reply at Ex. B.) According to the Russian Mission, in 1996, Defendant was appointed as Head of the MFA International Organizations Department's Division, which deals with "budgetary, financial, management, personnel, and other administrative issues of international organizations." (Def.'s Mem. Law at Ex. A.) As Head of the Division, the Mission states that Defendant performed functions on behalf of the MFA, such as providing counsel and guidance to members of the Russian delegation working in various UN bodies, and "contributing to the preparation and elaboration of Russian policy and approaches to different issues of multilateral and bilateral relations, including between Russia and the United States." (Def.'s Mem. Law at Ex. A; Def.'s Reply at Ex. B.) While the Mission states that Defendant was "on leave without pay" during the time Defendant was Chairman of ACABQ, it states that Defendant continued to "perform functions in the inter-

ests and on behalf of the MFA of Russia." (Def.'s Mem. Law at Ex. A.)

Defendant also states that he qualifies as a diplomatic agent because of his participation in the Geneva Group. According to the Russian Mission, Defendant actively participated in the preparation of position papers for the Geneva Group in 2004 and 2005 and attended the Group's meeting as a member of the Russian delegation.[3]

■ Although the Russian Mission has stated that Defendant performed duties on behalf of the Russian Federation in the United States at the time of his arrest and as part of the Geneva Group, diplomatic immunity is premised upon recognition by the receiving State, so that no person or government may "unilaterally assert diplomatic immunity." *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir.1984). "[R]ecognition by the executive branch is essential to establishing diplomatic status." *Id.* (citing Restatement (Third) of Foreign Relations Law of the United States § 461 Commentary at 30).

A court's reliance on the State Department's certification when determining diplomatic immunity has a long history in this country's jurisprudence. In 1890, the Supreme Court stated that "the certificate of the Secretary of State ... is the best evidence to prove the diplomatic character of a person." *In re Baiz*, 135 U.S. 403, 421, 10 S.Ct. 854, 34 L.Ed. 222 (1890).

---

ary and management issues of the United Nations. (Def.'s Reply at 11; Gov't.'s Mem. Law at Ex. J, ¶ 4.) The status of the Geneva Group as a "conference convened by the UN" is addressed later in this Memorandum & Order. *See infra* pp.17–19.

**3.** The Government challenges Defendant's participation in the Group by stating that Defendant's name did not appear on the 2004 and 2005 delegation lists for the Russian Delegation. However, the Russian Mission has confirmed Defendant's attendance in 2004, explaining that his name was mistakenly

omitted from the list. And, as for the 2005 meeting, Defendant was scheduled to attend, but was precluded from doing so as a result of his arrest in the instant case.

The Government has also argued that Defendant's attendance at the Geneva Group meetings does not entitle him to the immunity provided by the Vienna Convention, since the Group is not a UN organ or conference. However, the Vienna Convention's description of the functions of a mission does not specify such a requirement.

Courts have continued to find that recognition and certification by the State Department is necessary to establish diplomatic immunity. *See Carrera v. Carrera,* 174 F.2d 496 (D.C.Cir.1949); *Abdulaziz v. Metropolitan Dade County,* 741 F.2d 1328, 1331 (11th Cir.1984) (stating that "the courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status"); *United States v. Al–Hamdi,* 356 F.3d 564, 572 (4th Cir.2004) (noting that "it appears that no reviewing court has ever held that the State Department's certification is anything but conclusive"); *see also United States v. Kostadinov,* 734 F.2d 905 (2d Cir.1984); *Tachiona v. United States,* 386 F.3d 205, 213 (2d Cir.2004).

The Government has submitted a certification from the U.S. Department of State which states that in 1990, Defendant was notified and accepted by the State Department as a diplomatic member of the Permanent Mission of the Union of Soviet Socialist Republics ("USSR") to the United Nations in New York. Following the dissolution of the USSR, Defendant remained at the Permanent Mission of the Russian Federation to the United Nations. (Gov't.'s Mem. Law at Ex. G.) On March 18, 1996, the United Nations notified the United States that Defendant was terminated as a diplomatic member of the Permanent Mission of the Russian Federation on February 9, 1996. In September, 2002, Defendant was notified to the United States by the United Nations Secretariat in New York as a member of the Advisory Committee on Administrative and Budgetary Questions; the United States was notified of Defendant's December 31, 2005 termination from that position, in February, 2006.(Id.) The State Department has no record that the Russian Federation ever notified Defendant as a "member of its bilateral mission (embassy) or any consulate in the United States." (Id.)

■ Defendant has not furnished the Court with any proof that the State Department accredited him as a member of any mission.[4] Defendant's arguments that his participation in the Russian MFA and the Geneva Group fail to overcome this fatal deficiency. The Court notes that although the Russian Mission states in their letters to the Court that Defendant is a "Russian career diplomatic agent" and hence, entitled to full diplomatic immunity, the Russian government failed to follow any of the procedures required to notify the U.S. government of Defendant's diplomatic status, although it had followed such procedures in 1990 when Defendant was a diplomatic member of the Permanent Mission of the USSR, and then of the Russian Federation. (Gov't.'s Mem. Law at Ex. G.) In fact, it was the United Nations that sponsored Defendant's application for a visa, and provided notification to the State Department of Defendant's employ at ACABQ. (Id. at Exs. G and I.) In addition, the Russian Mission has stated that Defendant was "on leave without pay" since he was elected as Chairman of ACABQ. According to Black's Law Dictionary, "leave" is defined as "Extended absence for which one has authorization." BLACK'S LAW DICTIONARY 911 (8th ed.1999). "Leave" is similarly defined in Webster's Dictionary as "authorized esp[ecially] extended absence from duty or employment." WEBSTER'S NEW COLLEGIATE DICTIONARY 655 (1976). Defendant could not have been

---

4. In his reply, Defendant argues that the issuance of a "G–2" visa "clearly indicates the State Department's notification and recognition of the defendant's diplomatic status." (Def.'s Reply at 8.) However, as the Court discusses later on in this Memorandum & Order, the issuance of a visa alone is not conclusive or persuasive evidence of Defendant's diplomatic status. *See infra* pp.14–15.

both "on leave and without pay" and representing the Russian Federation while he was Chairman of ACABQ, especially since the Chairman of ACABQ must declare that he will not "seek or accept instructions in regard to the performance of [his] duties from any Government or other source external to the [United Nations]." (Gov't.'s Mem. Law at Ex. C.) Accordingly, the Court finds that Defendant has not established that he is entitled to immunity under the Vienna Convention as a diplomatic agent.

### 2. Visiting Foreign Official

Article VI, Section 11 of the United Nations Convention on Privileges and Immunities ("United Nations Convention") provides that:

> Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, while exercising their functions and during their journey to and from the place of meeting, enjoy ... immunity from personal arrest or detention [and] such other privileges, immunities, and facilities not inconsistent with [this Section] as diplomatic envoys enjoy.

21 U.S.T. 1418, art. IV, §§ 11(a), (g).

■ Defendant argues that, independent of his status as a diplomatic agent pursuant to his position with the Russian MFA, as Chairperson of the ACABQ, he is entitled to full diplomatic immunity under the United Nations Convention. (Def.'s

Mem. Law at 12–13.) Defendant contends that his status as a visiting foreign official is further supported by the issuance of a diplomatic visa in connection with his position on the ACABQ. In his reply, Defendant also states that his participation in the Geneva Group conference is a separate basis for his entitlement to full diplomatic immunity under the United Nations Convention.

#### a. The ACABQ

The Advisory Committee on Administrative and Budgetary Questions ("ACABQ") was established by the General Assembly "[t]o facilitate the consideration of administrative and budgetary questions by the General Assembly and its Administrative and Budgetary Committee." G.A. Res. 14(1), ¶ A(2), U.N. Doc. 14(1) (Feb. 1, 1946). The Advisory Committee is appointed by the General Assembly, and no two members can be nationals of the same state; members are "selected on the basis of broad geographical representation, personal qualifications and experience" and serve for a period of three years. G.A. Res. 32/103, ¶ 2, U.N. Doc. A/RES/32/103 (Dec. 14, 1977). The sixteen members are appointed by the General Assembly "in their individual capacity." The Secretary–General, *Report of the Secretary–General on the Comprehensive study of the question of honorariums payable to members of organs and subsidiary organs of the United Nations*, ¶ 48(a), U.N. Doc. A/53/643 (Nov. 5, 1998).[5] ACABQ is a

---

5. The Government cites the Secretary General's Report in its Memorandum of Law. Defendant, however, characterizes the quote as "a brief description of the Committee posted on the United Nations' website." (Def.'s Reply at 10.) The Court notes that the Secretary General's Report is not a mere posting on a website, and that the Government's reliance on the reference in the Report does not, as Defendant claims, "mischaracterize[] the true

framework of the [Advisory Committee]." (Id.)

According to Defendant, "While individuals serve as members of the Committee, similar to the United States legislative branch, each individual member of the ACABQ represents a Member State of the United Nations." (Id.) In support of this statement, Defendant cites a press release from the United States Mission to the United Nations, on March 12, 1998, at

subsidiary organ of the General Assembly. *See* UN General Assembly: Subsdiary Organs, http://www.un.org/ga/subsidiary/ (last visited July 10, 2006).

According to the "Regulations Governing the Status, Basic Rights and Duties of Officials other than Secretariat Officials, and Experts on Missions," the Chairman of ACABQ performs functions for United Nations "on a substantially full-time basis." (Gov't.'s Mem. Law at Ex. C, p.4.) Also, as the Court noted previously, the Chairman is also required to make a declaration that he will not "seek or accept instructions in regard to the performance of [his] duties from any Government or other source external to the Organization." (Id., p.6.)

Defendant argues that his participation in ACABQ does not establish that he was an employee of the United Nations. Instead, he contends that he was a "foreign official visiting the United Nations who is entitled to full diplomatic immunity." (Def.'s Mem. Law at 14.)

Defendant was a member of the ACABQ, after being elected to that position by the General Assembly in 2002, for a term of three years. He was then elected as Chairman of the Committee by members of the Committee for a term commencing January 1, 2004 until December 31, 2004, and was re-elected for another term commencing January 1, 2005 until December 31, 2005. (Def.'s Mem. Law at Ex. B.) Prior to 2002, Defendant was employed by Russia's Ministry of Foreign Affairs. Although the Permanent Mission of the Russian Federation to the United Nations declares that he retained the position of Head of Division in the staff table of the Foreign Ministry of Russia, during the time he was Chairman of the ACABQ, it acknowledges that he was "on leave without pay." (Id. at Ex. A.)

A review of UN documents support the Government's position that Defendant was not a "visiting foreign official," entitled to diplomatic immunity under the United Nations Convention. Indeed, it is clear from those documents that Defendant was working for the ACABQ in his individual capacity and was considered by the UN to be a full-time employee of the UN. As an employee of the ACABQ, the Defendant had only functional and diplomatic immunity as a UN official which was subsequently waived by the Secretary General.[6]

---

http://www.un.int/usa/98_45.htm. However, the Court has reviewed the press release and does not agree with Defendant's interpretation of the statements made in that release. The press release, as the Court understands it, *does not state* that each member of the ACABQ represents a Member State of the UN. The Defendant's repeated assertions in its Memorandum of Law concerning the press release appears to deliberately mischaracterize the statements made in that release. The press release does not talk about the nomination process for the ACABQ, and it certainly does not state that the Committee members serve as representatives of the governments who nominated them, and not, as UN Regulations state, in their individual capacities.

6. General Assembly Resolution 3188 (XXVII) grants the Chairman of ACABQ immunity under Article V and VII of the UN General Convention on Privileges and Immunities. G.A. Res. 3199 (XXVII) (Dec. 18, 1973). Article V, § 18 provides immunity from "all acts performed by [Officials] within their official capacity." 21 U.S.T. 1418, Art. V, § 18 (Apr. 29, 1970). In addition, Section 19 extends full diplomatic immunity to the Secretary General and all Assistant–Secretaries General. 21 U.S.T. 1418, Art. V, § 19. As "[p]rivileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves," the Secretary General is authorized to "waive the immunity of any official in any case where immunity would impede the course of justice." 21 U.S.T. 1418, Art. V, § 20.

This conclusion is not affected by the fact that Defendant was issued a "G–2" visa. Defendant argues that the issuance of his "G–2" diplomatic visa by the State Department evidences that he was notified to, and accepted by, the United States as a foreign representative with diplomatic immunity. He contends that the issuance of the "G–2" is proof, in and of itself, that the State Department accorded him diplomatic status and corresponding immunity.[7]

The "G–2" visa is issued to visiting representatives of a foreign government to an international organization, of which the foreign government is a member. *See* 8 U.S.C. § 1101(a)(15)(G)(ii).

The Second Circuit has stated that a visa "does not necessarily confer diplomatic immunity." *United States v. Kostadinov*, 734 F.2d 905, 912 (2d Cir.1984) (finding that the issuance of an A–1 visa did not confer diplomatic immunity since such status is only recognized by the issuance of a diplomatic immunity card and identification on official lists prepared by the U.S. government); *see also El–Jassem v. United States*, No. 95–1345, 1996 WL 680958, at *1 (2d Cir. Nov.25, 1996); *United States v. Al–Hamdi*, 356 F.3d at 573.

As is abundantly clear from UN reports, resolutions and regulations, Defendant was not part of ACABQ as a Russian representative, but served on ACABQ in his individual capacity. In addition, the visa issued to Defendant makes no mention of the Russian Ministry of Foreign Affairs, or the Geneva Group. Under "Annotations" the visa reads "ACABQ Chairman, United Nations, New York." (Def.'s Mem. Law at Ex. F.)

Hence, the issuance of a diplomatic visa is not conclusive "evidence that the Government recognizes the defendant as a visiting foreign official who is entitled to full diplomatic immunity under the United Nations Convention."[8] (Def.'s Mem. Law at 17.)

b. Geneva Group

In his reply, Defendant contends that he is also entitled to full diplomatic immunity under the United Nations Convention because he served as a representative of the Russian Federation to the Geneva Group, "a conference convened by the United Nations." (Def.'s Reply at 11.)

The Government has submitted a declaration of Mark P. Lagon, Deputy Assistant Secretary of State for International Organization Affairs in the U.S. Department of State. Lagon states that "The 'Geneva Group' is an informal group, now consisting of 15 countries, whose representatives meet semiannually in Geneva and New York City to discuss UN administrative, budget and management issues. The Geneva Group has no formal status and is not affiliated with the United Nations."

In his reply, Defendant maintains that the Geneva Group is a conference convened by the United Nations and faults the Government for failing to "cite any credible authority for this proposition."

The Court's search of the United Nations' website and documents did not reveal any reference to the Geneva Group as

---

7. Defendant also relies on the Form I–94 he received upon entering the United States a few days before his arrest, which noted his "G–2" visa classification. Defendant has not cited any authority that the receipt of an I–94 form confirms notification to the United States as a diplomatic agent.

8. Moreover, as previously noted, the State Department was not notified by the Russian Federation of Defendant's alleged status as a diplomat or a visiting foreign official.

an organ[9] or conference convened by the UN. In fact, in a daily press briefing by Stephanie Dujarric, Spokesman for the U.N. Secretary General, the Geneva Group was referred to as the "so-called Geneva Group." *See* http://www.un.org/News/briefings/docs/2006/db060421.doc.htm.

Defendant has failed to cite any authority for his position that the Geneva Group is an organ or "conference convened by the United Nations" for which he is entitled to full diplomatic immunity. Accordingly, the Court finds that Defendant's participation in the Geneva Group is not a basis to grant him immunity as a visiting foreign official.

## B. Post–Arrest Statements

Defendant also moves to suppress any and all post-arrest statements allegedly made by Defendant "and any and all fruits and leads therefrom." (Def.'s Mem. Law at 21.)

The Fifth Amendment of the U.S. Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Defendant claims that his Fifth Amendment rights were violated by the Government and seeks to suppress his post-arrest statements on two grounds: (1) Defendant states that he does not recall being given his *Miranda* warnings when he was first arrested, and hence, moves to suppress all pre-*Miranda* statements, and moves to suppress post-*Miranda* statements as tainted by the failure to give the *Miranda* warnings when Defendant was first arrested; and (2) Defendant states that he invoked his right to counsel when he re-quested a consular representative, and that all statements should be suppressed as any interrogation violated his constitutional right to counsel.

## 1. Suppression for Failure to Give *Miranda* Warnings

▮ The Second Circuit has stated that "[a]n assertion that *Miranda* warnings were not given, when the government asserts the contrary, ... creates a specific factual dispute. That dispute cannot properly be resolved without an evidentiary hearing." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir.1998). "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed and nonconjectural. ..." *United States v. Watson*, 404 F.3d 163, 167 (2d Cir.2005).

▮ Defendant does not state that he was not given *Miranda* warnings. Instead, he states in his declaration that "While en route to the FBI's office, [he had] no recollection of what [he] now know[s] to be [his] '*Miranda* rights.'" (Def.'s Decl. ¶ 8.) This one sentence in Defendant's declaration is not sufficiently specific, detailed or nonconjectural and therefore does not raise a contested issue of fact requiring an evidentiary hearing. *See e.g., United States v. Arthur*, No. 01 Cr. 276, 2002 WL 523254, at *4 (S.D.N.Y. Apr.5, 2002) (finding defendant's statement that he has no recollection of being read his *Miranda* rights to be an ambiguous statement and thus insufficient to create the type of factual dispute that triggers an evidentiary hearing).

---

**9.** The principle organs of the United Nations are the General Assembly, Security Council, Economic and Social Council, Trusteeship Council, Secretariat, and the International Court of Justice. See UN: Main Bodies, http://www.un.org/aboutun/mainbodies.htm (last visited July 10, 2006). A list of the subsidiary organs of the UN can be found at UN General Assembly: Subsidiary Organs, http://www.un.org/ga/subsidiary/ (last visited July 10, 2006).

### 2. Right to Counsel

Defendant next argues that a suppression hearing is warranted because his right to counsel was violated when federal agents continued to interrogate him after he requested a consular representative.

■ After being advised of his *Miranda* rights, any interrogation of the defendant must cease if the defendant invokes his right to counsel, until an attorney is present, or if the defendant reinitiates conversation. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Even if the defendant responds to police-initiated questioning after he has invoked his right to counsel, he has not waived his rights, and his statements are subject to suppression. *Id.* at 484, 101 S.Ct. 1880.

■ The invocation of counsel must be express. *See Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("[T]he suspect must unambiguously request counsel"). The court must conduct an objective inquiry into whether a reasonable officer under the circumstances, would understand the defendant's statements to be a request for counsel. *Id.* The defendant must make a statement " 'that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). "But if a suspect makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," law enforcement are not required to cease their interrogation. *Id.* (emphasis in original).

In his affidavit, Defendant states that he "asked to speak with a representative from the Consulate General of the Russian Fed-eration . . . or the Permanent Mission to the United Nations. . . ." (Def.'s Aff. ¶ 3.) He states that the Russian Mission provides various services to foreign representatives of the Russian Federation, including legal assistance, and that as a "Russian diplomat," Defendant "view[ed] the representative of the Consulate General and the Russian Mission as persons who can provide [him] with legal services." (Id.¶¶ 4–5.) He contends that he made the request for a consular representative "for the purposes of obtaining legal advice." (Id.¶ 6.) Upon arrival at the FBI's office, Defendant states that the FBI provided him with a form containing a list of rights, including the right to consult with a lawyer and to have one present during questioning. After reviewing that form, Defendant repeated his request to speak with a consular representative. (Id.¶ 9.) The FBI continued to question him, and did not make available to Defendant a consular representative. (Id.¶¶ 11–12.)

According to the FBI 302, at 8:40 PM, on the night of the arrest, after Defendant's arrival at 26 Federal Plaza in New York City, Statement # 2 "When Consular Notification is Mandatory" was read to Defendant. (Def.'s Mem. Law at Ex. C, p.2.) Defendant does not contest this. Statement # 2 states in pertinent part:

> Because of your nationality, we are required to notify your country's consular representatives here in the United States that you have been arrested or detained. After your consular officials are notified, they may call or visit you. You are not required to accept their assistance, but they may be able to help you obtain legal counsel and may contact your family and visit you in detention, among other things.

(Id., p.6.)

At 8:45 PM, he was advised of his constitutional rights and provided with a form

entitled "Advice of Rights." Special Agent Kathleen Diskin then advised Defendant "that a representative from the [Russian] Mission could not be present during the interview and the arrest process, and that he had the right not to talk to the reporting agents at this time without said representative and/or lawyer present." (Def.'s Mem. Law at Ex. C, p.2.)

Defendant argues in his Memorandum of Law that "Given that, in response to being alerted of his right to counsel, [Defendant] requested to speak with a representative from the Consulate General or the Russian Mission," his belief that he was requesting counsel was reasonable. Defendant also points to Special Agent Diskin's response to his request to speak with a consular representative—namely, that he had the right not to talk to the reporting agents at this time without said representative and/or lawyer present—as evidence that the FBI viewed his request as "analogous to an express request for counsel." (Def.'s Mem. Law at 27.)

■ The Court is not persuaded by Defendant's arguments. The Court finds that Defendant's request for a consular representative was not an express and unambiguous request for counsel, and that a reasonable officer would not have understood Defendant's request to be a request for counsel. The FBI agents clearly distinguished the separate and distinct roles of a consular representative and a lawyer when informing Defendant of his rights. Statement # 2 was read to Defendant *before* he was given his *Miranda* warnings. Statement # 2, alone, makes clear that the role of the consular representative is not identical to that of a lawyer; Special Agent Diskin also made this distinction clear when she informed Defendant that a consular representative could not be present for the interview and arrest process. Defendant never asked explicitly for an attor-

ney, and Statement # 2 and Special Agent Diskin's statement put Defendant on notice of the distinction between a consular representative and an attorney.

In light of the fact that Defendant failed to request counsel in an express or unambiguous manner, the FBI agents acted within the law when they continued the interrogation.

Accordingly, the Court finds that Defendant has no legal basis for suppression of his post-arrest statements.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss the Indictment and Motion for an Evidentiary Hearing are DENIED. The next status conference in this matter shall be held on August 14, 2006 at 10:30 AM. In the interests of justice, time is excluded until August 14, 2006. *See* 18 U.S.C. § 3161(h)(8)(A).

SO ORDERED.